Nott, Ch. J.,
delivered the opinion of the court.
The essential facts of this case are these:
On the 30th of September, 1881, the Ohiricahua Apaches were living at peace with the United States on the San Carlos Reservation in Arizona. On that day the approach of a body of troops awakened their suspicion, which increased into apprehension, that they wore to be attacked, punished, or removed. On the 1st of October they broke away from the reservation, like a nomadic tribe, carrying with them their wives and little ones and flocks and herds. On the 2d of October there was a collision between a portion of their number and a body of United States troops at a place called Cedar Spring, near Fort Grant. On the 3d the Indians attacked wagon trains, 12 miles north of Willcox, seizing and destroying the property and killing the teamsters. On subsequent days they were pursued by troops. They were in their war paint, the men of the band being in effect an armed rear guard. In eight days from the time-of their outbreak they crossed the line and took refuge in Mexico.
On these facts the position of the claimant is that these Indians were still in a state of amit.y with the United States; that they were not waging war; that they were exercising the right of removing to another country, of expatriating themselves ; that they sought no encounter with troops of the United *313 States; that the collision at Cedar Spring was caused by the troops firing on the Indians, and not by the Indians attacking the troops; that the seizure of supplies was incidental to their forcible escape, and, though not lawful, was not belligerent; and, finally, that their show of armed resistance to the pursuing troops was a part of the same intention to leave the country by the use of force, if necessary, but was not an act of war.
If these Indians had exercised their natural right of escaping from the reservation and making their way to Mexico, with no hostile manifestations and no acts of violence except in self-defense, it might be said that they, in a negative way, were still in amity with the United States;' but where every act was that of a retreating enemy, not resisting in self-defense, but needlessly killing and destroying, and, as in civilized warfare, regarding every individual on the one side as the enemy of every individual on the other, it can not be said that they were in amity with the United States. It was a war of only eight days, but it terminated, not by a voluntary return to the condition of peace, but by the interposition of an international barrier.
The books hold that when war exists every citizen of one belligerent is the enemy of every citizen of the other. Conversely, this court holds that when every white man, at a given time and in a certain territory, is found to be the enemy of every Indian, and every Indian is found to be the enemy of every white man, a condition of amity does not exist within the meaning of the fifty statutes which employ the word “ amity” to prevent war upon the frontier. If a party of bad white men or a party of bad Indians engaged in rapine and murder and the remainder of the white community and of the Indian tribe did not take up arms, it was crime, but not war. If, on the contrary, the condition of affairs was such that every man on the one side stood ready to kill any man on the other side and military operations took the place of peaceful intercourse, hostility so far existed that amity ceased-to exist and the purpose of the statute in allowing indemnities was at an end.
It has been urged in this and other cases that when a num ber of Indian tribes have been removed to a reservation the tribal entity of each ceases; that they become in legal effect one tribe, and that the question of amity is to be directed to all of the Indians thus brought together. That is to say, the *314 question to be considered is not whether a majority of the Ohiricahuas, or of the JVIescaleros, or of the Mimbres, remained in amity, but whether a majority of all the Indians on the reservation remained in amity.
This Indian depredation act has brought before the court two legal problems of extreme difficulty, which are closely related and yet which are not identical. The first is that oi a proper party defendant. What is a “tribe, baud, or nation'’ as party defendant within the intent of the statute? The answer to this question has been given before — that it is the Indian entity or body politic which may be entitled to receive annuities, which is or may be recognized as such in the Interior Department, and consequently which may be liable to respond in damages, if judgment goes for the claimant in the case. It is manifest that such a band, tribe, or nation, however insignificant or unorganized, has an interest in the suit and a legal right to defend.
The second legal problem to be solved is that of a tribe or band in its political relations with the Government. What is the tribe, within the intent of the statute, which must be in amity with the United States?
The court, in some of the cases heretofore decided which presented this question, applied to it the principles applicable to conditions of peace and war between civilized nationalities. In the cases of the well-defined Indian tribes with whom we have entered into separate and distinct treaties, with whom we have distinctively engaged in war, and wifh whom we have specifically made peace, this application of the principles of international law cleared the cases from obscurity and made the determination of the question involved comparatively easy. But as the litigation of these Indian depredation cases has gone on the fact has become more and more apparent that the Southwestern tribes during the last fifty years have had no defined or definable nationality or tribal entity, and that they were little more than robber bands dwelling in the fastnesses of the mountains or moving like Arabs on the arid plains. The Apaches, for illustration, supposed to be one people, were a unity only in race. In fact they consisted of bands having different habitats, with no common purpose, no semblance of government, tribal or confederate, occasionally cooperating in war against a common enemy, as civilized nations do, but being in their several entities each as distinct as if the others did *315 not exist. They had no “long house,” like the Iroquois, in which the representatives of the Six Nations met to confer concerning the common welfare, and no several organization. These bands, too, were each of them paltry in numbers, so paltry that if they had appeared as rioters in one of our great cities the local police would have overcome them and restored order, without the aid of the military, in a single day. Their strength was not in numbers or organization, but in their incomparable bravery, hardihood, and military genius — a genius which, until General Crook made friends with a portion of them and organized Apache scouts to follow and fight Apache Indians, had successfully resisted and eluded the military forces of the United States and Mexico. More than a hundred years ago the Apaches required the presence of 4,000 Spanish dragoons to protect the Mexican frontier.
In dealing with the question of the amity of such a tribe as a band of the Apaches, the court has been more and more compelled to fall back upon the purpose of the earlier statutes which created a liability and gave to these claimants their right of action. That purpose, as has been said before, was to keep the peace — to prevent Indian warfare upon the frontier. The Government said both to the white man and to the Indian, “This depredation or this outrage is wrong, is indefensible, and you shall be indemnified for your losses so far as property is involved, provided always that you refrain from war.” If the frontiersmen and the Indians did not comply with this simple condition, if the purpose of offering the indemnity was not effective, the claimants have no right to seek it under the act of 1891.
The practical question, then, is, Who were the Indians whose amity was to be maintained1? Who were the Indians so affiliated with the depredators in fact that the depredators might reasonably be regarded as a part of them and they be regarded as a body whose amity it was desirable to maintain ¶
In dealing with this question the court has held, first, that a nation, tribe, or band will be regarded as an Indian entity where the relations of the Indians in their organized or tribal capacity has been fixed and recognized by treaty; second, that where there is no treaty by which the Government has recognized a body of Indians, the court will recognize a subdivision of tribes or bands which has been recognized by those officers of the Government whose duty it was to deal with and report *316 tbe condition of tbe Indians to the executive branch of the Government; third, that where there has been no such recognition by the Government, the court will accept the subdivision into tribes or bands made by the Indians themselves. (Tully v. The Apache Indians, 32 C. Cls. R., 1.)
But in the application of this rule the court has had to go further and recognize bands which simply in fact existed, irrespective of recognition, either by the Department of the Interior or the Indian tribes from which the members of the band came. Victoria’s band of Apaches was merely a combination of individuals from different bands associated together for the purpose of waging war against the United States. The band did not exist until its warfare began. It had no geographical home or habitat. A ferocious sense of injustice induced the Indians to prefer death to submission, and they fought the troops of the United States until the band and its members were extinct. (Montoya v. The Mescalero Apaches, 32 id., 349.) Black Hawk’s band was a combination of individuals from different bands associated for the purpose of ravage and plunder. Their predatory warfare continued during a period of three years, and when it was brought to an end, the band dissolved and its members merged in the bands whence they had come. (Herring v. The Ute Indians, ib., 536.) The principle which governed these cases was that a tribe in amity could not be made responsible for the acts of its members engaged in organized warfare, and that where there was a state of actual warfare there was no amity, and consequently no jurisdiction. Generally it maybe said that whenever it appears that the depredations complained of were not the exceptional acts of individual Indians, members of a tribe or band in amity, but were of such a general nature that they must be characterized as incidents of an existing Indian war, no liability on the part of the tribe can be maintained, and the jurisdiction of the court is at an end.
The Ohiricahuas were an isolated mountain band; they had their .own habitat in remote valleys distinct from the valleys or mountains of the other bands; they fought their own battles; they pursued their own policy; they were hunted down and captured as Ohiricahuas and were brought in and placed upon a reservation as a distinct and well-known military enemy. On the reservation they remained distinct, neither in fact nor in a legal sense merging with the other tribes. In their *317 outbreak and escape from the San Carlos Eeservation, in 1881, they still retained their tribal distinctiveness. For the court to hold that they had become an integral part of all the Indians upon the reservation and that all of the Indians upon the reservation, little better than prisoners of war, had become a new, distinctive Indian nation or tribal organization would be to introduce a new and artificial element into this branch of litigation founded not on the facts of the case but on a speculative theory.
It must therefore be held in this case that the Ohiricahuas were the Indian tribe or band whose amity was essential to liability on the part of the Government, and that they were not in amity at the time when this depredation was committed.
The judgment of the court is that the petition be dismissed.