**FORT SILL APACHE TRIBE OF the STATE OF OKLAHOMA et al.**

v.

**The UNITED STATES.**

**Appeal No. 2–72.**

United States Court of Claims.

Decided May 11, 1973.

I. S. Weissbrodt, Washington, D. C., attorney of record, for appellants; David Cobb, Weissbrodt & Weissbrodt, Abe W. Weissbrodt, and Ruth W. Duhl, Washington, D. C., of counsel.

A. Donald Mileur, Washington, D. C., with whom was Asst. Atty. Gen., Kent Frizzell, for appellee.

Before COWEN, Chief Judge, DUR-FEE, Senior Judge, and DAVIS, SKEL-TON, NICHOLS, KUNZIG and BEN-NETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

BENNETT, Judge, delivered the opinion of the court:

The case now before the court presents several novel problems which do not appear to have been resolved before. The issues all revolve around the extent to which an Indian tribe may claim compensation for wrongdoing to the tribe unrelated to property rights, when the actual victims of the wrongdoing were the individual members of the tribe. For reasons to be detailed, the court affirms the decision of the Indian Claims Commission, 26 Ind.Cl.Comm. 281 (1971), in which it dismissed the claim without trial on the grounds of lack of jurisdiction over the subject matter, section 2, clause (2), and for failure to state a claim upon which relief could be granted under section 2, clause (5), of the Indian Claims Commission Act, 60 Stat. 1049, 1050, 25 U.S.C. § 70a(2), (5). The pertinent facts need to be outlined before examining the issues and their resolution.

The Chiricahua Apache Tribe, which is the predecessor to the appellants [1] now before the court, originally occupied ancestral lands covering large portions of the States of Arizona and New Mexico, along with portions of the Republic of Mexico. In the years 1876 and 1877, the tribe was officially removed from its ancestral tribal lands to the San Carlos Indian Reservation in Arizona. It is clear, however, that the Government authorities were less than successful in getting all of the Chiricahuas to stay on the reservation. The result was that at various

times, several groups of aggressive, warlike Chiricahuas continued to occupy portions of the ancestral tribal lands, thereby coming in sporadic conflict with white settlers, miners, and ranchers. The hostile relations which existed between the Indians and the settlers reached a critical stage by 1886 when it became apparent that there was an urgent need to end the forays of the hostile groups of Apaches and attempt to bring peace to the Southwest.

There were several conflicting proposals presented for bringing about the desired peace. General Nelson Miles prepared a plan which, in part, called for relocating the Apache reservation to an area in the Oklahoma Indian territory, as a means of moving the tribe far enough from its original homelands to discourage further wanderings from the reservation. The plan ultimately adopted, however, was presented by General Sheridan and resulted in the wholesale relocation in 1886 of the entire Chiricahua Apache Tribe, men, women and children then at the San Carlos Reservation to Fort Marion near St. Augustine, Florida, where they were interned as prisoners of war. The hostile bands were likewise rounded up, one at a time, and removed to Florida. The surrender in Mexico, September 4, 1886, of Geronimo, Natchez, and other Apaches classified as hostile, represented the end of the forays by the Chiricahuas. Mangus, Geronimo, Natchez, and their followers were confined at Fort Pickens, Florida. In 1887 and 1888, the prisoners were moved to the Mount Vernon Barracks near Mobile, Alabama. It will be assumed for the purposes of this appeal, that this confinement constituted a wrongful arrest, imprisonment, and excessive punishment of some individual Indians.

During the first 3½ years of captivity, approximately 119 of the 498

1. The petition of appellants was filed by the Fort Sill Apaches of the State of Oklahoma and by three individual Indians in a representative capacity on behalf, respectively, of the Warm Spring Band of Apaches, the Chiricahua Band of Apaches and the Fort Sill Apaches. All three groups are components of the aboriginal Chiricahua Apache Tribe.

Apache prisoners died, some apparently due to the effects of being moved from a high, very dry climate to a very low, humid climate. One hundred twelve of the Indian youth were sent to the Indian school at Fort Carlisle, Pennsylvania, where 30 died despite good sanitary conditions. Consumption was the principal cause of death. In the prison camps living conditions were bad. One Army report indicated the 6.8 percent death rate (as against a normal 2 percent) was aggravated among the young children by "their parents' neglect of the simplest instructions of physicians and the murderous quackery of old squaws." There was a high birthrate among the Indians in captivity so that their net loss in the first 3½ years was 38 of the original 498. The population, however, continued to decline over-all.

In October 1894, the 259 remaining Chiricahuas were again moved; this time to the Fort Sill Military Reservation in Oklahoma. They were kept at Fort Sill as prisoners of war until April 2, 1913, when they were finally released. After the period of internment, the majority of the members of the tribe went to the Mescalero Reservation in New Mexico,[2] while the rest stayed at the Fort Sill Reservation.[3]

In their petition before the Indian Claims Commission (ICC), the plaintiffs alleged that the 27 years of internment suffered by the members of the tribe gave rise to a cause of action under both 25 U.S.C. § 70a(2) for a cause sounding in tort [the clause 2 claim], and under 25 U.S.C. § 70a(5) for a claim based on the absence of "fair and honorable dealings" [the clause 5 claim]. It is important to note that the appellants in this case are now asserting only a tribal claim for injuries to the tribe's tradi-

tional power and structure resulting from the years of internment. The appellants are not seeking damages for false arrest and imprisonment of each member of the tribe, apparently recognizing that these would be little more than multiple individual claims and therefore outside the jurisdiction of the Indian Claims Commission.[4] *See*, Cherokee Freedmen v. United States, 161 Ct.Cl. 787 (1963); Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 161 Ct.Cl. 258 (1963). In seeking tribal damages for this type of injury, appellants are presenting a novel argument. They allege that the wrongful imprisonment of the members of the Chiricahua Tribe, simply because they were members, constituted a compensable injury to the tribe as well as to the individual Indians involved. They argue that the internment of the tribe's members took from the tribe its power to hold territory, its power to gather and accumulate food, horses and other resources necessary to its communal existence, and its power to govern its people. The loss of these powers, the appellants contend, constitutes a separate and distinct compensable injury to the tribe, recoverable under both clause 2 and clause 5 of 25 U.S.C. § 70a.

Any solution to the problem posed by the appellants requires the court to construe the pertinent sections of the Indian Claims Commission Act of August 13, 1946, ch. 959, 60 Stat. 1049, 25 U.S.C. § 70. On this matter the court has said:

> * * * it should be possible to construe the statute liberally to affect its remedial purpose and intent, and strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary reme-

---

2. Now identified as the Chiricahua & Warm Spring Bands.

3. Now identified as the Fort Sill Apache Tribe of the State of Oklahoma.

4. *See*, 25 U.S.C. § 70a, § 70i. In a claim brought by the Fort Sill Apache Tribe for the false arrest and imprisonment of 450 members of the Warm Spring & Chiricahua Bands based on these same facts, the Indian Claims Commission dismissed the petition since it concerned the rights of the individual Indians and not the rights of the tribe. (Ind.Cl.Comm. Docket No. 30), 1–A Ind.Cl.Comm. 137, 141 (1949).

dies. [Otoe & Missouria Tribe v. United States, 131 F.Supp. 265, 271, 131 Ct.Cl. 593, 602, cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).]

In order to determine if the claim presented by the appellants represents an undue extension of an extraordinary remedy, the court must consider separately each of the possible bases for granting the ICC jurisdiction of these claims.

The primary ground on which jurisdiction might rest is the language of clause (2) of 25 U.S.C. § 70a.[5] The appellants have attempted to characterize a series of multiple torts committed on the individual members of this tribe as also constituting a tort against the tribe itself making clause 2 applicable. There is a separate cause of action resting with the tribe only if the Act can be read to recognize a distinct right in the tribe to foster and protect its own form and structure. The focal point here is whether clause 2 recognizes such a protectible right in the tribe.

As support for its assertion that clause 2 does cover these facts, the appellants point to Baltimore & Potomac R.R. v. Fifth Baptist Church, 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883). The church in that case sued the railroad for disrupting its services and destroying the value of its property for church purposes by building and operating a locomotive storage and repair shop immediately adjacent to the church. The facility was found to be noisy, smoky, smelly, and dirty. After finding that the defendant's shop constituted a private nuisance, the Court stated:

> * * * The plaintiff was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled, thus necessarily tending to destroy the use of the building for the purposes for which it was erected and dedicated.

> * * * the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages. * * *. [108 U.S. at 335, 2 S.Ct. at 731.]

The appellants contend that this case recognizes a right in the church to sue for the thwarting of its common purposes and the annoyance and discomfort of its members, and therefore has important parallels to the case at hand. Characterized as the appellants have done, the Baltimore & Potomac R.R. case might serve as authority for the proposition that wrongdoing with respect to the individual members of the group also results in a distinct injury to the organization itself. The court does not read the cited case in that way, however. It seems clear that the Supreme Court was not awarding damages to the church because the members of the congregation were inconvenienced by the defendant nor because the number of people in the congregation declined due to the defendant's operation, but because defendant's actions constituted a nuisance which served to interfere with the use of the church's property. The church was asserting a property right of its own, not a right of the individual parishioners.

A situation somewhat more analogous to the facts at hand can be found in Cherokee Freedmen v. United States, *supra*. There the appellants were not listed on the rolls of the Dawes Commission Report as officially being members of the Cherokee Tribe, and as a result, they were denied a pro rata portion of an award obtained by the tribe from the United States. The court found that the resolution of the appellants' claim would depend on individual proof of each

---

5. " * * * (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; * * *."

Freedman's right to be enrolled. There was no group interest or common right among the appellants. The court summarized by saying:

> \* \* \* Since the claims are individual, they could be prosecuted singly, in a proper forum, without involving other Freedmen or any entity; combining them into one proceeding does not transform such individual claims into group claims cognizable by the Claims Commission, or change their basic individual character. [161 Ct.Cl. at 789.]

But, the *Cherokee Freedmen* case, relied upon by the Government, seem to miss the mark of the appellants' argument, since it does not address in depth the critical issue of whether there is a distinct cause of action and right resting with the tribe itself. In that case the appellants were joining, into one claim, many individual claims which contained common elements of proof. The court found this to be impermissible under the Act, as it would be if our appellants were merely seeking to claim damages on behalf of the individual members of the tribe for their false arrest and imprisonment. With respect to the crucial issue now before the court, it simply stated there was no group interest or right being asserted by the *Cherokee Freedmen* appellants. While that was true under those facts, it provides little assistance in attempting to determine under the facts now before the court, whether the claim of these appellants is a valid assertion of a group interest or right which the court might recognize within the language of the Act.

The court is faced with the resolution of this problem under circumstances in which the legislative history has a bearing on interpretation of the statute. For the following reasons, it finds that the ICC Act was not intended to cover, under clause (2), claims of the type now being pressed by the appellants. One of the problems the court has with the appellants' position is illustrated by the facts in Gila River Pima-Maricopa Indian Community v. United States, 427 F. 2d 1194, 190 Ct.Cl. 790, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). A portion of the appellant's claim in *Gila River* was based on the allegation that "damage was caused by the Government when it 'undertook to, and did, subjugate petitioner under wardship to a stagnation of self-expression \* \* \* [and] bridled petitioner into cultural impotency.'" 427 F.2d at 1195, 190 Ct.Cl. at 792. For the purposes of that decision, the court assumed that this was a tribal claim and went on to dismiss the claim on other grounds. Both in *Gila River* and in the case now before the court, the tribes were seeking recovery for essentially the same type of injury. Each felt Government action caused damage to the power structure and viability of the tribal unit; that is, damage to Indian peoplehood in general. Opening the door to appellants in this case would leave it open for a multitude of other claims based on facts more closely akin to those in *Gila River*. While the court recognizes that a variety of injustices have been inflicted upon Indians both before and after they were relocated on the reservations, it nonetheless does not appear that Congress in 1946 thought this type of injury would come within the coverage of the Claims Commission Act. It has been noted that the Act "is a synthesis of those '\* \* \* classes of cases \* \* \* which have heretofore received congressional consideration in the form of special jurisdictional acts. \* \* \*.'" *Gila River*, 427 F.2d at 1200, 190 Ct.Cl. at 801. The court has not been made aware of any of the special jurisdictional acts which were intended to cover tribal injuries of the type presented here. The apparent view of the Congress in 1946 was that these claims would be "for specific deprivations of land or property or rights protected by treaty, statute, or then-existing law. The instances cited in the Congressional history are of that kind." 427 F.2d at

1200–1201, 190 Ct.Cl. at 802. H.R.Rep. No. 1466, 79th Cong., 1st Sess. (1945).

■■ There can be no doubt that the Apache Tribe did not prosper from the injuries suffered by its constituent members. But, the injury to the tribe is subsumed by the multitude of individual claims. As in *Cherokee Freedmen, supra,* the measure of damages for any tribal injury arising out of the imprisonment of the Apaches would seem to be the cumulative damage to the individual victims of imprisonment who did not contest their imprisonment by seeking writs of habeas corpus. We need not at this late date conjecture whether such efforts would have been successful, but the legal remedy was there. The significance is, however, that had the remedy been invoked successfully we would not have the instant claim. The question now is whether the Indian Claims Commission Act has given the Commission jurisdiction to award damages to the tribe for wrongs suffered by individual Indians who were allegedly falsely arrested and imprisoned. Twice before the Commission has answered this question in the negative. Confederated Tribes of the Colville Reservation v. United States (Docket No. 186), 25 Ind. Cl.Comm. 99 (1971); Fort Sill Apaches v. United States (Docket No. 30), 1–A Ind.Cl.Comm. 137, 143 (1949). The court agrees with the Commission, reads clause (2) of 25 U.S.C. § 70a as a whole, and determines as a matter of law that the Act does not recognize in the tribe a separate and distinct right to recover for injuries so closely tied to those suffered personally by individual Indians, which injuries are the whole basis for any damage to the tribe as such. The jurisdiction of the Commission is only over claims by the tribes, bands, or other identifiable groups of American Indians which have group rights. There is no grant of jurisdiction to hear claims on behalf of individual Indians. The legislative history as well as the language of the Act makes this clear.[6]

Appellants also rely upon clause (5) of 25 U.S.C. § 70a, the "fair and honorable dealings" clause, as a basis for arguing that the ICC has jurisdiction over its claim. The claim presented by the appellants under clause (5) is identical to that presented and discussed with respect to clause (2), and suffers from many of the same weaknesses. The court has said that the reach of the "fair and honorable dealings" clause is limited to somewhat fewer situations than a literal reading would imply. More specifically, the United States is held liable under this "fair and honorable dealings" clause where "by its own acts, it has undertaken special duties which it has failed to fulfill." Lipan Apache Tribe v. United States, 180 Ct. Cl. 487, 502 (1967). The issue therefore, under the clause 5 portion of the appellants' claim, is whether the United States has undertaken a special duty to protect and foster the traditional power and structure of the tribal organization. We think it has not done so.

The appellants point to the language in the Treaty of July 1, 1852, 10 Stat. 979, and the Indian Trade and Intercourse Act of June 30, 1834, ch. 161, § 12, 4 Stat. 730, 25 U.S.C. § 177, as creating just such a special duty on the part of the United States, which duty was breached by the internment of the members of the tribe under conditions which eroded the structure and power of the tribe. The Treaty of 1852 was, however, a treaty of peace, which fact this court recognized in Lipan Apache Tribe, *supra* at 501. The Commission described the 1852 Treaty in Fort Sill Apache Tribe v. United States (Docket Nos. 30–A and 48–A), 19 Ind.Cl.Comm. 212, 238 (1968), stating:

* * * This negotiation was intended primarily as a treaty of peace,

---

6. On legislative history, see the conversation between the Assistant Commissioner of the Bureau of Indian Affairs and Chairman Henry M. Jackson at the Hearings on H.R. 1198 and H.R. 1341 Before the House Committee on Indian Affairs, 79th Cong., 1st Sess., at 77 (March 28, 1945).

not a settlement of conflicting claims. Subsequently, all parties violated the terms of the Treaty of Santa Fe and no one is in position to assert any benefits or rights thereunder.

The court agrees with this assessment of the treaty so far as creating any viable "special relationship" on the part of the United States is concerned. Further, and specifically, it contains no language even implying a duty upon the United States to protect the structure and existence of the Chiricahua tribal unit.

■ The Indian Trade and Intercourse Act of 1834 suffers from the same failure to create a special relationship or duty under the circumstances of this case. The court held in Seneca Nation v. United States, 173 Ct.Cl. 917, 925 (1965), that the Act "created a special relationship between the Federal Government and those Indians covered by the legislation, with respect to the disposition of their lands, and that the United States assumed a special responsibility to protect and guard against unfair treatment in such transactions." In short, the Indian Trade and Intercourse Acts have consistently been interpreted as creating obligations on the part of the United States to protect the Indian tribes in dealings involving the disposition of their lands.[7] The special relationship created by this statute, as amended, has never been extended to the intangible factors of tribal well-being, cultural advancement, and maintenance of tribal form and structure. Nothing in the statute or its legislative history requires a contrary conclusion or modification of this view.

■ In this light, the court is constrained to agree with the decision reached by the ICC on this issue, finding that no special relationship existed between the Chiricahua Tribe and the United States sufficient to bring this claim within the "fair and honorable dealings" clause. It should be further noted that, given the discussion of the nature of the appellants' claim with respect to clause (2), the court will not lightly imply a duty upon the Government of the type sought by appellants when the same claim is raised under the clause (5) language. This is not to preclude the possibility that under some treaty language the Government may have undertaken the responsibility of protecting the tribal structure of a given group, and have thereby created a definable group interest, damage to which would involve a breach of the "fair and honorable dealings" clause. Such a special relationship, however, must be clearly indicated. This is not the situation in the case at hand where the pertinent treaty and Act of Congress do not deal with the matter at all. The court, therefore, finds that the appellants' claim does not fall within the jurisdiction of the ICC under the "fair and honorable dealings" clause and the Commission was correct in holding that as to clause (5) the petition failed to state a claim upon which relief can be granted under the ICC Act.

Because we have disposed of the appeal on other grounds, it will not be necessary to discuss the arguments raised by defendant that the case is barred as res judicata because it is alleged to be identical with ICC Docket No. 30, Fort Sill Apaches v. United States, 1–A Ind.

7. Pursuant to clause (4) section 2, of the ICC Act, appellants in the instant case claimed a taking of their lands and were awarded $16,489,096 therefor, after deduction of offsets. Fort Sill Apache Tribe v. United States, 26 Ind.Cl.Comm. 198 (1971) ; 25 Ind.Cl.Comm. 352 (1971) ; 22 Ind.Cl.Comm. 527 (1970) ; 19 Ind. Cl.Comm. 212 (1968). Appeal by defendant from said award is pending before this court in Appeal No. 3–72. Also, a claim is presently pending before the Commission in Docket No. 182 for compensation for minerals, timber and other resources allegedly removed from the Apache lands prior to the date of the taking of the lands in 1886. The Apaches have been in litigation on these matters before the Commission continuously since 1948.

Cl.Comm. 137, 139 (1949), wherein there was a claim involving the arrest and imprisonment of the Apaches as outlined in this case, ICC Docket No. 49. The Commission dismissed the claim in both dockets for similar reasons. However, it did not bar the claim in Docket No. 49 either for res judicata or collateral estoppel, assuming for the purpose of ruling on appellants' motion for summary judgment that the parties were not identical and that the causes of action were different. However, the Commission did say Docket No. 30 was stare decisis to No. 49. Final judgment has been entered by the Commission in No. 30 and no appeal has been taken. ICC Docket No. 49 now before the court is our first contact with the problem. For the same reasons, it is not necessary to discuss the appellants' argument that the internment of the Indians destroyed "sovereignty" of their tribe and that the United States has violated its "general duty" not to mistreat the tribe and has offended "basic principles of law, equity and morality" and has bordered on genocide with its tortious conduct. These and other arguments have been ably and forcefully presented by opposing counsel.

The story of the wars between the United States and the Apache Indians is one of harsh treatment on both sides. The Apaches raped, plundered, and murdered on a grand scale, "carrying death and fire and desolation over American and Mexican territory to an extent which is almost incredible." Scott v. United States, 33 Ct.Cl. 486, 489 (1898). The Federal Government determined it to be necessary to field at one time an army of 5,000 men against the Apaches. The Mexicans had 4,000 soldiers in the field. Battles with Apaches went on for over 100 years. In 1886, when Geronimo surrendered, the organized hostilities came to an end. This court described the final surrender as involving "more prolonged negotiation than the army of Burgoyne at Saratoga or of Lee at Appomattox, and concluded by the granting of terms that the surrender be 'as prisoners of war to an army in the field'—

terms which effectually removed the sagacious savage and his followers beyond the jurisdiction of the civil authorities." Scott v. United States, *supra* at 488. We see then that the decision to put the Apache Indians in confinement in Florida was a military measure taken to prevent the possibility of a resumption of warfare. We do not consider the merits of that decision. The question now is not how mistreated the Indians were or how much provocation there was to explain the actions of the United States, but whether the Indian Claims Commission has jurisdiction of the claim.

With the perspective of history and the benefits of hindsight and ignorance of the temper, passions, and conditions of the times, it is easy to say that the actions of the United States were perhaps unwarranted and that reparations should be given to the Apache Indians for their suffering after surrender. The Congress knew all about the Apache wars and their aftermath when it enacted the Indians Claims Commission Act in 1946. This generous and remedial legislation did not, however, provide for claims by individual Indians, but only by tribes and identifiable bands and groups. We take the law as we find it.

The early bound Reports of the Court of Claims contain scores of cases wherein claims were made and judgments rendered under the so-called Indian Depredation Act of March 3, 1891, ch. 538, 26 Stat. 851. The United States was charged with defense of these claims wherein Indian tribes were joined as defendants. The statute reserved to the Government, and to the Indians themselves, all rights to "counterclaim, setoff, claim of damages, demand, or defense whatsoever of the Government or of the Indians * * *." Sec. 4, 26 Stat. 852. The various Apache tribes and bands appear repeatedly in the Reports.

Under the depredation statute, judgments were given only against Indian tribes living in amity with the Government. Where an outlaw band seceded

from a tribe it was not held against the tribe. Scott v. United States, *supra*; Montoya v. United States, 32 Ct.Cl. 349 (1897), aff'd, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901). But, where the entire Chiricahua Tribe at one time was at war with the United States, it could not be held liable in a suit at civil law for its depredations. In Dobbs v. United States, 33 Ct.Cl. 308 (1898). The answer given to such a problem was military in nature. It was the constant, overriding purpose of the Government to pacify the Indians and to make treaties which would bring them under the Nation's laws. Whatever civil remedies are to be allowed, for adjustment of ancient, legitimate Indian grievances is, however, for Congress to say. It has not said anything which would permit recovery under the theories advanced by appellants under Docket No. 49. To grant appellants the relief demanded would be an undue extension of the extraordinary remedies allowed under the Indian Claims Commission Act. The decision of the Commission is, accordingly, affirmed.

Affirmed.

DAVIS, Judge (concurring):

I join the court's opinion which, as I understand it, holds that the tribe states no claim under the Indian Claims Commission Act because (a) the claims asserted are essentially individual, rather than tribal, and therefore not cognizable under either Clause (2) or Clause (5) of Section 2 of the Act; (b) insofar as the tribe attempts to state a claim as a tribe it fails to allege any valid basis for believing that the Federal Government undertook to protect this tribe *as a tribe* —as distinguished from protecting individual members of the tribe from personal harm—from acts of the Federal Government which would injure or destroy the tribal structure or existence; [1] and (c) the Indian Claims Commission Act does not attempt to redress any and all wrongs, to the tribe or its members, which a tribe may wish to present.[2]

Though the "fair and honorable dealings" clause covers certain kinds of "moral claims" by a tribe for injury to itself, the effort to read that provision as encompassing any and all "moral claims" of whatever type was rejected by all the judges in Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 190 Ct.Cl. 790, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). I have no adequate reason to change my position. The legislative history is not entirely clear but in my view its balance swings against the position that Clause (5) was meant to be wholly unlimited and open-ended.

NICHOLS, Judge (dissenting):

With all respect I am unable to join or agree with the majority. I think the claimant tribe was entitled to a hearing on the merits. It is not that I see it as certain or even probable that they would prevail. I know that one's simplistic assessment of the rights and wrongs of

---

1. I see no obligation or promise, for instance, which would have precluded the Congress, in the latter part of the 19th century, from unilaterally but peacefully disbanding the tribe and insisting that its members assimilate into the general population. Since we must disregard the personal injuries to individual Indians, a tribal claim based on such a peaceable dissolution of the tribe would stand on the same footing as the present claim which takes on irrelevant color from the inhumane conduct which is recited by appellants. Moreover, it seems to me immaterial whether the Federal Government was (or thought it was) at war with the Apaches, and I do not understand the court's opinion as resting on any such ground.

2. For me, there is not much help in the analogy to international claims. In peacetime as well as war, nations often espouse the individual claims of their nationals against other countries, but the Indian Claims Commission Act does not place Indian groups in a like position vis-a-vis their members; this court and the Commission have consistently held that individual claims are excluded from coverage even though espoused by the tribe.

this old case could suffer much transformation as the evidence unfolded. It is just that I fail to see this as the kind of case the Indian Claims Commission could refuse to consider at all, as wholly outside its statutory jurisdiction. I think, if claimants have their day in court, the purpose of Congress is better served, even if they lose.

The majority falls into three main errors, which I will take up in a different order than the court does, in order to present my own position more logically. They are: I, The Commission has no jurisdiction over claims rising out of or on account of acts of war by the United States armed forces; II, The Commission has no jurisdiction over wrongs to Indians on which the court says they could have sued individually; and III, Clause (5) of Section 2 of the Act, 25 U.S.C. § 70a, "claims based on fair and honorable dealings that are not recognized by any existing rule of law or equity" only applies to claims rising out of a "special relationship" assumed towards a tribe by the United States. I conclude with a Section IV which considers some techniques of interpretation of the statute which I believe we should employ, and the use of which supports my position.

I. *Military operations.* I have no doubt, as the court says, that the prolonged imprisonment of the claimant Apache Tribe rose out of the hostilities that had raged between them and the United States, and was an act of war. In Scott v. United States, 33 Ct.Cl. 486 (1898) we held that the state of affairs obtaining was war.

The parties, and the decision below, pass by this absolutely vital fact with no notice, although appellant does say in its brief, to do it justice, that the tribe was held from 1886 to 1913 as prisoners of war. That is a true statement, as shown below, and it implies the rest. The parties must have been aware of it, but doubtless did not see how to fit it into their theories of the case. The diligence of the court in *sua sponte* bringing the fact forward into notice and reasoning as to its legal consequences, can only be commended. However, it confronts us with a problem as to which we have not had the assistance of counsel. I put forward my own 2¢ worth on the topic with some hesitation. If the case should be remanded for further consideration below, the Commission should not consider itself bound by anything we say on this topic.

We are dealing, then, with an act of war. The United States is not liable for acts of war in many circumstances where, in the absence of war, it would be. Juragua Iron Co. v. United States, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520 (1909); United States v. Pacific R.R., 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634 (1887); Aris Gloves, Inc. v. United States, 420 F.2d 1386, 190 Ct.Cl. 367 (1970). However, war has or, in those days, had, its own laws. In United States v. Pacific R.R., *supra*, the Court said at p. 233 of 120 U.S., at p. 493, of 7 S.Ct.:

It has been held by this court in repeated instances that, though the late war [Civil War] was not between independent nations, yet, as it was between the people of different sections of the country, and the insurgents were so thoroughly organized and formidable as to necessitate their recognition as belligerents, the usual incidents of a war between independent nations ensued. The rules of war, as recognized by the public law of civilized nations, became applicable to the contending forces. Their adoption was seen in the exchange of prisoners, the release of officers on parole, the recognition of flags of truce, and other arrangements designed to mitigate the rigors of warfare. The inhabitants of the Confederate States on the one hand, and of the states which adhered to the Union on the other, became enemies, and subject to be treated as such, * * *

Persons who violate such recognized rules of war are accountable. In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L. Ed. 499 (1946). Officers of our own

armed forces who breached the laws respecting civilian non-combatants would be accountable. In re Yamashita, *supra,* at p. 16, and fn. 3, 66 S.Ct. 340. Therefore, I conclude, for purposes of the present claim, the fact the parties were at war does not in and of itself license any sort of frightfulness, but only changes the standards of "fair and honorable dealings" from those of peace to those of war. It would be the duty of the Commission to establish what the standards were, whether of warfare between civilized nations generally, or special ones developed for frontier conflicts with savage tribes, and apply them to the history as proven. It appears from the *Scott* decision, *supra,* there were several other instances of Indian hostilities recognized as war, therefore standards there must have been. It is significant that, as stated in the *Scott* case, 33 Ct. Cl. at p. 495 the Government in 1886 allowed the Apaches to surrender "as prisoners of war to an army in the field." This stipulation would have been meaningless unless rules such as are mentioned in the *Pacific Railroad* case existed. The report of the Commissioner of Indian Affairs, 1913, describing the release of the survivors, calls them still "prisoners of war". The parties, arguing the case on their own chosen theories, have not told us what the rules were, but their existence can be assumed as a matter of judicial notice. Since 20th century combatants feel justified in perpetrating any horror, we assume too readily this was always so, but it will be conceded, I think, that a 19th century Indian claim ought to be evaluated according to the more civilized standards of the 19th century.

In the Apache war with its background of rape, plunder, and murder, death, fire, and desolation which the court alludes to, justifying the imprisonment may well prove easier than condemning it; in any case, we should not fear to cast the light of day on this murky chapter of our nation's past, if Congress wished it.

II. *Individual wrongs.* The court supposes that individual imprisoned Apaches could have sued for *habeas corpus,* or something, and therefore, the wrongs were personal and individual, not to a tribe, band or other identifiable group. The claimants attempt to show damage to the tribe, as a tribe. I do not think these inquiries are relevant. Once we identify the mass imprisonment as a war measure, it falls into the category of issues which are typically and traditionally assigned for political, group settlement. If we conceive, as I think we should, that the Act intends the tribe, as a tribe, to prosecute claims a sovereign nation would typically prosecute, instead of its citizens, then claims for breaches of the laws of war are clearly in that class.

Consider, for example, the Alabama Claims. These were purely private and individual in the sense that the losses were all of privately owned ships and cargoes, taken and destroyed by Confederate cruisers, for whose depredations England was responsible because she had fitted them out in violation of her duties as a neutral, under international law or the laws of war. By the theory adopted by the majority here, the United States Government should have abstained leaving the shipowners to sue someone in England, or petition to Parliament. Of course we know nothing of that kind happened. Our Government asserted its claim by at times acrimonious diplomacy, obtaining ultimately a treaty, 17 Stat. 863, which submitted the issues to arbitration. The arbitrators awarded the United States $15,500,000, which England paid.

In United States v. Weld, 127 U.S. 51, 8 S.Ct. 1000, 32 L.Ed. 62 (1888), the Supreme Court was called upon to review a question of jurisdiction of the Court of Claims arising out of disputes about the distribution of the award thus received by the United States. As to the rights of individual citizens not specifically provided for in the Treaty, the Court said at p. 56, 8 S.Ct. at p. 1003:

\* \* \* The award of $15,500,000, directed to be paid by Great Britain, was to the United States as a nation. The text of the treaty itself speaks of

the "claims on the part of the United States," and in Article 7 the gross sum was "to be paid by Great Britain to the United States." * * * The fact that the Congress of the United States undertook to dispose of this fund, and to administer upon it, in accordance with its own conceptions of justice and equity, precludes, at least for the purposes of this decision, judicial inquiry into such questions. The claimants had to rely upon the justice of the government, in some of its departments, for compensation in satisfaction of their respective claims; * * *

In another case, Williams v. Heard, 140 U.S. 529, at pp. 537–538, 11 S.Ct. 885, at pp. 886–887, 35 L.Ed. 550 (1891), where the Supreme Court was called upon to review the ultimate disposition of the award made by Great Britain, the Court stated:

It was held in United States v. Weld, 127 U.S. 51, [8 S.Ct. 1000, 32 L.Ed. 62], that this award was made to the United States as a nation. The fund was, at all events, a national fund to be distributed by Congress as it saw fit. True, as citizens of the United States had suffered in person and property by reason of the acts of the Confederate cruisers, and as justice demanded that such losses should be made good by the government of Great Britain, the most natural disposition of the fund that could be made by Congress was in the payment of such losses. But no individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded, nor was Congress under any legal or equitable obligation to pay any claim out of the proceeds of that fund.

Likewise in the cases involving French Spoliations, during the Napoleonic wars, it was recognized that the United States had the authority to "bargain" away certain of its Treaty obligations to France in exchange for France being free of compensation for damages done to individual Americans. This court in the case of Gray v. United States, 21 Ct.Cl. 340, 391–392 (1886) while considering claims of United States Citizens against the United States arising out of the Treaty of 1800 with France stated:

* * * All claims are "national" in the sense of the *jus gentium*, for no nation deals as to questions of tort with an alien individual; the rights of that individual are against his Government, and not until that Government has undertaken to urge his claim —not until that Government has approved it as at least *prima facie* valid —does it become a matter of international contention; then, by adoption, it is the claim of the nation, and as such only is it regarded by the other country. * * *

While the court in *Gray* advised Congress that it was of the opinion that the 1800 Treaty resulted in a Fifth Amendment taking by the United States, more recently in the case of *Aris Gloves, Inc., supra*, this court held that loss of property by an American citizen as the result of the Second World War and transactions which followed it did not result in a Fifth Amendment taking by the United States. Because of the different factual situations, while the court reached different results, the cases are not inconsistent. Of import here, however, is the fact that in both cases this court recognized that claims by an individual citizen on account of war measures of other nations accrue to the state, and the individual has no direct claim against the other nation.

The court suggests, not citing authority, that the imprisoned Indians could have petitioned for *habeas corpus*. Just petitioned: it doesn't say they would have gotten anywhere. Appellee in its brief cites for this United States ex rel Standing Bear v. Crook, 25 Fed.Cas. No. 14,891, p. 695 (C.C.D.Neb.1879), a most interesting case, in which Indians in military custody did indeed petition successfully for *habeas corpus*. However, the court expressly points out that Standing Bear's tribe, the Poncas, were

friendly, not at war with the United States, and the custody had to be defended under the civil laws, the Indian Affairs Commissioner having employed the military as mere policemen. A fair inference from this opinion is, if our imprisoned Apaches had petitioned for *habeas corpus,* and if the return to the writ had showed sufficiently that they were hostile Indians detained as prisoners of war under the war powers, the court would not have ordered them discharged from custody. In Ex Parte Milligan, 71 U.S. (4 Wall) 2, 18 L.Ed. 281 (1866) the Court found it relevant to hold that Milligan did not enjoy the rights of a prisoner of war, and therefore could not be saddled with the burdens, p. 131.

Thus I would hold, though the wrongful imprisonment of an individual Indian is an individual matter, the imprisonment of an entire tribe as a war measure generates a claim for the tribe. The tribe was, of course, not an independent sovereign nation, but I fail to see how that matters. That Act makes it like a sovereign in its control over claims justiciable under the Act. For a recent view of the nature of Indian sovereignty, *see,* McClanahan v. State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

III. *Clause 5 of Section 2.* A careful reading of the Lipan Apache Tribe v. United States, 180 Ct.Cl. 487 (1967), shows that the question of there having to be a "special relationship" for liability under that clause, was raised in the context of wrong having been done by third parties, the alleged dishonorable dealing by the United States being simply failure to protect. See p. 502. There is no suggestion there that the intentional infliction of harm by the directly employed agents of the United States is not dishonorable dealing. In Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 190 Ct.Cl. 790, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), we again considered the above clause.

The claim was for furnishing of inadequate health care and education, but the claimants could prove no express undertaking by statute or by treaty to furnish any at all. The extended discussion of the clause, with its emphasis on the lack of a special relationship, must be read in light of the nature of the claim. Nowhere does Judge Durfee say that the intentional infliction of harm would be non-actionable in the absence of a "special relationship" other than the relationship of guardian and ward that exists towards all Indians. In that context, what more "special relationship" could one ask for?

IV. *How to Interpret the Statute.* Our law has always recognized the possible existence of claims against the Government, based on moral considerations, "equity" in the broad sense, or justice, and the Supreme Court has held that Congress has power under the Constitution to pay them. United States v. Realty Co., 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215 (1896). However, it added at p. 444, 16 S.Ct. at page 1127:

In regard to the question whether the facts existing in any given case bring it within the description of that class of claims which Congress can and ought to recognize as founded upon equitable and moral considerations and grounded upon principles of right and justice, we think that, generally, such question must, in its nature, be one for Congress to decide for itself. Its decision recognizing such a claim and appropriating money for its payment, can rarely, if ever, be the subject of review by the judicial branch of the government. \* \* \*

In United States v. Choctaw Nation, 179 U.S. 494, at p. 532, 21 S.Ct. 149, at p. 164, 45 L.Ed. 291 (1900) Mr. Justice Harlan (the elder) said, that for the judiciary to attempt to correct an unjust Indian treaty

\* \* \* would be an intrusion upon the domain committed by the Constitution to the political departments of the Government. \* \* \*

In Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, at p. 354, 65 S.Ct. 690, 89 L.Ed. 985 (1945), may be found a concurring opinion by Mr. Justice Jackson, in which Mr. Justice Black joined, which should be re-read at least weekly by all judges and lawyers engaged in Indian claims litigation. Though all is good, I quote and emphasize from p. 355, 65 S.Ct. p. 700:

We would not be second to any other in recognizing that—judgment or no judgment—a moral obligation of a high order rests upon this country to provide for decent shelter, clothing, education, and individual advancement of the Indian. * * *

It is most unfortunate to try to measure this moral duty in terms of legal obligations and ask the Court to spell out Indian legal rights from written instruments made and probably broken long ago and to put our moral duty in figures as legal damages. The Indian problem is essentially a sociological problem, not a legal one. We can make only a pretense of adjudication of such claims, and that only by indulging the most unrealistic and fictional assumptions.

To what extent Jackson was a *vox clamantis in deserto* may be judged by the expectations of Congress in enacting the Act, here to be construed, only two years later.

The express purpose of the 1946 Act was to provide a forum where all claims by Indian tribes could be heard so as to free Congress from consideration of individual bills which sought compensation for wrongs done to the Aboriginal American. As stated by the Chairman of the Committee on Indian Affairs, Mr. Jackson (a different Jackson, now Senator), during House consideration of the bill. 92nd Cong.Rec. pps. 5312–13, House Debate on HR 4497, May 20, 1946:

* * * In fact, since 1928 when at the suggestion, I believe, of President Hoover, a comprehensive study was made by the Brookings Institu-

tion of our Indian administration, every group, private or public, that has studied this Indian problem has come to the conclusion that there ought to be a prompt and final settlement of all claims between the Government and its Indian citizens, and that the best way to accomplish this purpose is to set up temporarily an Indian Claims Commission which will sift all these claims, subject to appropriate judicial review, and bring them to a conclusion once and for all. That, in brief, is what H.R. 4497 seeks to accomplish.

* * * * * *

* * * And let us make sure that when the Indians have their day in court they have an opportunity to present all their claims of every kind, shape, and variety, so that this problem can truly be solved once and for all without coming back to haunt us or our successors in the form of further bills to extend the jurisdiction that this bill would confer on an Indian Claims Commission.

* * * * * *

The most important section of the bill is section 2, which defines the jurisdiction of the claims and counterclaims that the Indian Claims Commission is to consider. It was the unanimous opinion of the committee that the jurisdiction of the Commission ought to be broad enough so that no tribe could come back to Congress 10 years from now and say that it had a meritorious claim which the Claims Commission was not authorized to consider.

This apparent desire to include all possible claims in the jurisdiction of the Commission is reflected in the House Report of the Bill.

H.Rep.No. 1466, 79th Cong., 1st sess. (1945), p. 2: * * * giving them a full and untrammeled right to have their grievances heard * * *; p. 3: Purpose of the Bill * * * It would require all pending Indian claims of whatever nature, contractual

and noncontractual, legal and nonlegal, to be submitted * * *

*Jurisdiction*

In order that the decisions reached under the proposed legislation shall have finality it is essential that the jurisdiction to hear claims which is vested in the Commission be broad enough to include all possible claims. If any class of claims is omitted, we may be sure that sooner or later that omission will lead to appeals for new special jurisdictional acts. And if the class of cases omitted is one which the Congress has in the past declared to be worthy of a hearing, in one or more jurisdictional acts, it is probable that future Congresses will likewise grant a hearing to such claims, and the chief purpose of the present bill, to dispose of the Indian claims problem with finality, will have been defeated.

Testimony before the Senate by persons representing the Justice Department indicate that while that Department sought the amendment of the House version of the Bill, it recognized the expansive nature of the remedies afforded to Indian Tribes. Thus in testimony given before the Senate Committee, on Indian Affairs, 79th Cong., 2nd sess., July 1, 12 and 13, 1946, at pps. 54 and 58, Mr. Chambers of the Department of Justice testified as follows:

\* \* \* \* \* \*

Now, the third, the claims based upon fair and honorable dealings, was already in the bill, I believe, as No. 6, but the only change that we propose there is to indicate that those claims were in addition to the other two, that is to say, "that are not recognized by any existing rule of law or equity."

Consequently, we felt that the Commission then would have jurisdiction over all legal and equitable claims and over all that might be called moral claims.

The CHAIRMAN. And what have you excluded?

Mr. CHAMBERS. We have excluded—we think we have excluded nothing, but removed questions of interpretation.

The CHAIRMAN. Well, for example?

Mr. CHAMBERS. For example, I can illustrate to you, Mr. Chairman. Take (4) there; line 11 is stricken through—
claims on account of any breach of duty committed to the injury of the claimant by any officer or agent of the United States while acting within the apparent scope of his authority.

Now, we figured that if you allow claims in tort with respect to which the claimant would be entitled to sue if the United States were suable, we had really covered that. So that (3) and (4) were, it seemed to us, covering somewhat the same ground, and it would be simpler to provide in the way we did.

\* \* \* \* \* \*

Mr. CHAMBERS. Mr. Chairman, may I say this: I cannot understand why, if we provide, as we proposed here, to take in all cases in law and equity, including cases, to be safe, arising in tort, and then we say "all moral claims"—why anybody should have an objection on the ground that we have not included all types of claims.

\* \* \* \* \* \*

It should be noted that while the Senate version of the final Bill deleted certain provisions of the House Bill, the Conference Committee Report took care to state that "the change was not intended to deprive the claimants of the right to invoke the jurisdiction of the Commission in any case which would have been cognizable under the language of the bill as it passed the House" (H. Rep. 2693, p. 5, 79th Cong., 2nd sess. (1946)).

Of interest also though not strictly legislative history, is a statement made

during the House debate by Congressman Case of South Dakota (Vol. 92, Pt. 4, Cong.Rec. 5319 (1946)):

### WOUNDED KNEE CLAIMS

The bill will not remedy every wrong that has been done the Indian tribes of this country but its passage here and in the body at the other end of the Capitol and its signature by the President will open the door for the settlement of honest claims which have never had their day in court.

As an illustration, I might say that in my opinion this bill, if enacted into law, will make possible consideration of the claims of the Sioux Indians who were injured or suffered losses in the Wounded Knee massacre. That is an identifiable band or group of Indians whose claims have never been determined in court, although as the result of hearings which were obtained when I was a member of the Indian Affairs Committee, a few years ago, a bill for settlement was favorably reported.

We who have taken the oath and put on the robe can do no better, I think, than to shrug our shoulders, roll up our sleeves, and do our very best to justify the expectations of infallibility entertained of us. At the same time, it seems to me we must watch ourselves to avoid slipping into the excessive legalism we as lawyers, are normally prone to, wrongly limiting our task to the intellectual games so revolting to Mr. Justice Jackson. The Congress sought to put us on a broader plateau. It is error to pretend we face purely legal issues. Excessive legalism, a forgetting that the tribunal is called on not just for legal niceties, but statecraft too, produces such absurdities as Tlingit & Haida Indians v. United States, 389 F.2d 778, 182 Ct.Cl. 130 (1968), in which we denied these tribes of fishing Indians all compensation for their fisheries, but instead paid them for their gold mines they had never had. In deciding whether a claim is within or outside the Act, in doubtful cases, a valid technique is to consider whether any distinction exists, that would appeal to Congress, between the involved claim and those that are clearly covered. United States v. Native Village of Unalakleet, 411 F.2d 1255, 188 Ct.Cl. 1 (1969).

Turning again to the language of the Act and looking to how it has been applied by the Commission and the court it should be noted that the Act only permits claims by identifiable groups of Indians and not individual claims. However, the Act specifically provides for claims sounding in tort. A reasonable conclusion is that Congress intended that Tribes be able to claim compensation for tortious acts committed against them. In light of the legislative history of the Act it is also reasonable that such claims were to include that area of tort other than torts against property. The legislative history also indicates that claims arising under "fair and honorable dealings" were seen as being in addition to those provided for in the other sections of the Act. It appears that it was the intent of Congress to include in this clause the possibility of claims arising wholly on moral grounds. Finally, of interest also is the matter of set-offs. The Act permits set-offs of gratuitous expenditures made on behalf of the Tribe against a recovery by the Tribe. If the Government can set-off expenditures that do not involve property rights, it stands to reason that the Tribe can likewise make claims for deprivations which arose outside the scope of rights in tangible property.

The expansive nature of the claims which might be brought under the Act was recognized by this court in the case of Otoe & Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 283–284, 131 Ct.Cl. 593, 621–622, cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).

* * * The legislative history of the Act establishes that from the beginning in 1928, certain members of Congress desired the enactment of a

bill which would settle extra-legal or moral claims of Indians against the United States, including claims based on their Indian title property right in land which the Government had either taken without the formality of a treaty, or which the Government had acquired under ratified treaties procured by fraud, duress, unconscionable consideration, etc., or concerning which the Government had been guilty of dealings less than fair and honorable. This desire on the part of certain members of Congress became the desire of the majority of Congress and, with the passage of the Act in 1946, became the legislative intent expressed in clauses (3), (4) and (5) of section 2.

This meaning, or legislative intent, revealed by the legislative history, merely corroborates the literal meaning of those clauses and renders them consistent with each other and with the legislative purpose also revealed in the Act's language and its history.

If the Congress intended that the Act be limited in scope to claim for land it would have so stated. On the contrary the Act contains the most expansive language to describe the types of claims which may be brought. Specifically, clause (2) of section 2 of the Act provides for "all other claims in law or equity, including those sounding in tort" and clause (5) of this same section provides for claims based upon "fair and honorable dealings that are not recognized by any existing rule of law or equity." It is hard to imagine how Congress could have written a more broadly worded jurisdictional statute.

The idea that the Act was limited to land and property rights got its start, I believe, from President Truman's ambiguous pronouncement upon signing the Act, in which he said the Act

\* \* \* removes a lingering discrimination against our First Americans and gives them the same opportunities that our laws extend to all other

American citizens to vindicate their property rights and contracts in the courts against violations by the Federal Government itself. (Ehrenfeld, Legislative Material on the Indian Claims Commission Act of· 1946, p. 715.)

Immediately preceding (same volume, p. 713) is Interior Secretary Krug's letter to the President recommending he sign the legislation. He says:

\* \* \* *For the future* they will be permitted to sue on the same basis as their fellow citizens of other races to vindicate *contract and property rights.* \* \* \* (Emphasis supplied).

Obviously Krug, and therefore Truman too, were referring to the post-1946 provision now codified as 28 U.S.C. § 1505. This is not as sweeping as the pre-1946 provisions and includes no clause relating to "fair and honorable dealings." This court has never held, or has held only in dictum, that pre-1946 claims must relate to land or property. To the contrary, Judge Davis says, concurring in *Gila River Pima-Maricopa, supra,* 427 F.2d 1200–1201, 190 Ct.Cl. at 802:

\* \* \* The Act was not designed to grant compensation for all the detriment accruing to the Indians by our ongoing policy toward them but, rather, had the more limited goal of paying for specific deprivations of land or property *or* rights protected by treaty, statute, or then-existing law. \* \* \* (Emphasis supplied.)

This clearly contemplates claims not related to land or property and if "then-existing law" includes the laws of war so far as they relate to hostilities with Indians, I believe it can be taken as correct, though I do not exclude the possible existence of valid moral claims on other bases. Judge Durfee for the court in the same case refers to H.Rep. 1466, 79th Cong., 1st sess., as saying the jurisdictional section of the Act was a synthesis of cases which have heretofore received consideration under special jurisdictional acts, but he adds in a foot-

note 5, 427 F.2d p. 1200, 190 Ct.Cl. p. 801, the Report also says:

" * * * If any class of claims is omitted, we may be sure that sooner or later that omission will lead to appeals for new special jurisdictional acts. * * * "

It says more than that, as quoted above. I am certain the real intent was that a novel type of claim, if presented to the Commission, should be considered. If, as stated in the petition, it appealed to the Commission's mind as one that had a foundation in justice and equity, it should proceed to trial and fact finding. If proof failed, that was that; if it succeeded, the Commission would have to find the facts and put itself mentally in the shoes of Congress and decide what Congress would have done with a special Act based on similar facts.

We have to consider frequent suits under 10 U.S.C. § 1552, for the correction of military records "to correct an error or remove an injustice." This was passed by the same Congress in the same year and with a purpose in common with the Indian Claims Act, *i.e.*, to get rid of a multitude of private bills. We encounter the same tendency of lawyers there as here, namely to focus on correcting error and forgetting all about removing injustice, without regard to what Congress might have done had it retained its original jurisdiction. *See, e.g.*, Skaradowski v. United States, 471 F.2d 627, 200 Ct.Cl. —— (decided January 18, 1973); and my comment on that case (concurring opinion) in Mayer v. United States, 201 Ct.Cl. —— (decided March 16, 1973). There may be doubts about casting this kind of issue in a pseudo legalistic mold and assigning a part in it to an Article III court, but our role is only the traditional one of judicial review, and all we have to do is to consider the quasi-legislative duties and roles of the non-Article III factfinding bodies and take them into realistic account in arriving at our decisions.

The Commission held itself not bound by collateral estoppel or *res judicata*, but

only *stare decisis*. We have not had a case like this before, so there is no *stare decisis* here. In my opinion the Indian Claims Commission had jurisdiction to consider this case and its holding it had not was reversible error.

DURFEE, Senior Judge, and KUNZIG, Judge, join in the foregoing dissenting opinion.