**JOINT TRIBAL COUNCIL OF the PASSAMAQUODDY TRIBE et al., Plaintiffs,**

v.

**Rogers C. B. MORTON, Secretary, Department of the Interior, et al., Defendants, and State of Maine, Intervenor.**

**Civ. No. 1960.**

United States District Court, D. Maine, N. D.

Jan. 20, 1975.

As Amended Feb. 11, 1975.

Thomas N. Tureen, David C. Crosby, Barry A. Margolin, Calais, Me., Robert E. Mittel, Portland, Me., Stuart P. Ross, Washington, D. C., Robert S. Pelcyger, and David H. Getches, Boulder, Colo., for plaintiffs.

Peter Mills, U. S. Atty., Portland, Me., Floyd L. France, Chf. Litigation Section and Anthony S. Borwick, Asst. Atty. Gen., Civil Div., Dept. of Justice, Land & Natural Resources Div., Washington, D. C., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

Plaintiffs in this action are the Joint Tribal Council of the Passamaquoddy Indian Tribe and the Tribe's two governors, who are suing in their individual and official capacities and as representatives of all members of the Tribe. Defendants are the Secretary of the Interior, the Attorney General of the United States, and the United States Attorney for the District of Maine. The State of Maine has been permitted to intervene as a party defendant. Plaintiffs seek a declaratory judgment that the Indian Nonintercourse Act, 1 Stat. 137 (1790), now 25 U.S.C. § 177, forbidding the conveyance of Indian land without the consent of the United States, is applicable to the Passamaquoddy Tribe and establishes a trust relationship between the United States and the Tribe. This Court has jurisdiction under 28 U.S.C. § 1331, Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), and declaratory relief is sought pursuant to 28 U.S.C. § 2201. Plaintiffs also invoke applicable provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. The case has been submitted upon a stipulated record, briefs and oral argument.

### The Historical Background

The Joint Tribal Council of the Passamaquoddy Tribe is the official governing body of the Passamaquoddy Tribe, a tribe of Indians residing on two reservations in the State of Maine. It is stipulated that since at least 1776 the present members of the Tribe and their ances-

tors have constituted and continue to constitute a tribe of Indians in the racial and cultural sense.

Plaintiffs allege that until 1794 the Passamaquoddy Tribe occupied as its aboriginal territory all of what is now Washington County together with other land in the State of Maine. During the Revolutionary War, the Tribe fought with the American colonies against Great Britain. In 1790, in recognition of the primary responsibility of the newly-formed Federal Government to the Indians in the United States, Oneida Indian Nation v. County of Oneida, *supra* at 667, 94 S.Ct. 772; United States v. Sante Fe Pacific R. Co., 314 U.S. 339, 345, 347–348, 62 S.Ct. 248, 86 L.Ed. 260 (1941), the First Congress adopted the Indian Nonintercourse Act, which as presently codified, 25 U.S.C. § 177, provides in pertinent part:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.[1]

Plaintiffs allege that in 1794, four years after passage of the 1790 Nonin-

tercourse Act, the Commonwealth of Massachusetts, Maine's predecessor in interest[2], negotiated a treaty with the Passamaquoddies, by which the Tribe ceded to Massachusetts practically all of its aboriginal territory. It is further alleged that out of the 23,000 acres which the 1794 treaty reserved to the Tribe, Maine and Massachusetts have sold, leased for 999 years, given easements on, or permitted flooding of approximately 6,000 acres. The complaint asserts that the United States has not consented to these transactions and therefore that they violated the express terms of the Nonintercourse Act.

Since the United States was organized and the Constitution adopted in 1789, the Federal Government has never entered into a treaty with the Passamaquoddy Tribe, and the Congress has never enacted legislation which specifically mentions the Passamaquoddies. Furthermore, since 1789, the contacts between the Federal Government and the Tribe have been sporadic and infrequent. In contrast, the State of Maine has enacted comprehensive legislation which has had a pervasive effect upon all aspects of Passamaquoddy tribal life. The stipulated record clearly shows that the Commonwealth of Massachusetts and the State of Maine, rather than the Fed-

1. The first Nonintercourse Act passed in 1790, 1 Stat. 137, 138, provided that "no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." By the second Nonintercourse Act passed in 1793, this language was amended to read as follows: "No purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the Constitution." 1 Stat. 329, 330. This version was carried forward, without major change, in the 1796 Act, 1 Stat. 469, 472; the 1799 Act, 1 Stat. 743, 746; the 1802 Act, 2 Stat. 139, 143; the 1834 Act, 4

Stat. 729, 730; and in Rev.Stat. § 2116, now 25 U.S.C. § 177.

2. Maine was formerly a District of Massachusetts. In 1819 Massachusetts passed legislation, commonly known as the Articles of Separation, which permitted, subject to the consent of Congress, the separation of the District of Maine from Massachusetts, and the establishment of Maine as an independent state. Act of June 19, 1819, Mass. Laws, ch. 61, p. 248. The Articles of Separation provided that Maine would "assume and perform all the duties and obligations of this Commonwealth towards the Indians within said District of Maine, whether the same arise from treaties or otherwise; . . . " Shortly thereafter, Congress approved of Maine's admission to the Union. Act of March 3, 1820, ch. 19, 3 Stat. 544. The Articles of Separation were incorporated into the Maine Constitution as Article X, Section 5. Me.Const. art. 10, § 5.

eral Government, have assumed almost exclusive responsibility for the protection and welfare of the Passamaquoddies.[3]

### The Present Action

On February 22, 1972 representatives of the Passamaquoddy Tribe wrote to the Commissioner of the Bureau of Indian Affairs, Department of the Interior, and requested that the United States Government, on behalf of the Tribe, institute a suit against the State of Maine, as a means of redressing the wrongs which arose out of the alleged unconscionable land transactions in violation of the Nonintercourse Act. The letter urged that the requested action be filed by July 18, 1972, the date as of which such an action would be barred by 28 U.S.C. § 2415(b), a special statute of limitations for actions seeking damages resulting from trespass upon restricted Indian lands.[4] On March 24, 1972 the Commissioner recommended to the Solicitor of the Department of the Interior that the litigation be instituted and advised the Solicitor that 28 U.S.C. § 2415(b) might bar a suit after July 18, 1972. Defendants, however, despite repeated urgings by representatives of the Tribe, failed to take any action upon their request.

On June 2, 1972 plaintiffs filed the present action seeking a declaratory judgment that the Passamaquoddy Tribe is entitled to the protection of the Nonintercourse Act and requesting a preliminary injunction ordering the defendants to file a protective action on their behalf against the State of Maine before July 18, 1972. Following a hearing on June 16, 1972 the Court ordered defendants to decide by June 22, 1972 whether they would voluntarily file the protective action sought by plaintiffs. In addition,

the Court directed defendants, in the event their decision was in the negative, to state their reasons for so deciding and to show cause on June 23, 1972 why they should not be ordered to bring suit. On June 20, 1972 the Acting Solicitor of the Department of the Interior advised the Assistant Attorney General, Land and Natural Resources Division, Department of Justice, by letter, that no request for litigation would be made. The reasons, as stated in the letter, were as follows:

As you are aware, no treaty exists between the United States and the Tribe and, except for isolated and inexplicable instances in the past, this Department, in its trust capacity, has had no dealings with the Tribe. On the contrary, it is the States of Massachusetts and Maine which have acted as trustees for the tribal property for almost 200 years. This relationship between the Tribe and the States has apparently never been questioned by the Tribe until recently.

\* \* \* \* \* \*

In view of the Court's Order of June 16, 1972, requesting it be advised of the Secretary's decision on the Tribe's request by June 22, 1972, this Department has again reviewed its position. and has again determined that no request for litigation should be made.

The Department does not reach its decision lightly. On the one hand, we are aware that the tribe may thus be foreclosed from pursuing its claims against the State in the federal courts. However, *as there is no trust relationship between the United States and this tribe,* we are led inescapably to conclude that the Tribe's proper legal remedy should be sought elsewhere. \* \* \* (emphasis supplied).

---

3. The contacts between the Federal Government and the Passamaquoddies, and between Massachusetts and Maine and the Passamaquoddies, since 1776, as disclosed by the documents stipulated into the record in this case, are set forth in detail in the Appendix to this Opinion.

4. Congress has since extended the time for filing such an action to July 18, 1977. Act of October 13, 1972, P.L. 92–485, 86 Stat. 803.

On June 22, 1972, by means of a written Notice filed with the Court, enclosing a copy of the June 20, 1972 letter from the Department of the Interior to the Department of Justice, defendants notified the Court that they would not voluntarily file the requested action. The Notice stated:

> You are hereby further notified that *consistent with the decision of the Interior Department,* the Assistant Attorney General in charge of the Land and Natural Resources Division, Department of Justice, acting under and by delegation from the Attorney General, has decided not to institute an action against the State of Maine as requested by plaintiffs' counsel. (emphasis supplied).

At the conclusion of the show cause hearing held on June 23, 1972 the Court ordered defendants to file the requested protective action against the State of Maine prior to July 1, 1972.[5] On June 29, 1972 defendants complied with the Court's order by filing an action, United States v. Maine, Civil No. 1966 N.D., in this Court.[6]

On February 1, 1973 plaintiffs filed an amended and supplemental complaint in the present action, abandoning their original request for injunctive relief and seeking only a declaratory judgment that the Passamaquoddies are entitled to the protection of the Nonintercourse Act. On June 17, 1973 the State of Maine was permitted to intervene in the action as a party defendant. On July 15, 1974, following the completion of discovery, plaintiffs filed a second amended and supplemental complaint.

The action is presently before the Court on the basis of plaintiffs' second amended and supplemental complaint, defendants' and intervenor's answers thereto, a stipulated record, briefs and oral argument.

### The Issues Presented by the Present Action

In their second amended and supplemental complaint, plaintiffs have dropped their original request for injunctive relief and seek only a declaratory judgment. Their basic position is that the Nonintercourse Act applies to all Indian tribes in the United States, including the Passamaquoddies, and that the Act establishes a trust relationship between the United States and the Indian tribes to which it applies, including the Passamaquoddies. Therefore, they say, defendants may not deny plaintiffs' request for litigation on the sole ground that there is no trust relationship between the United States and the Tribe.[7] In opposition, defendants and intervenor contend that only those Indian tribes which have been "recognized" by the Federal Government by treaty, statute or a consistent course of conduct are entitled to the protection of the Nonintercourse Act and, since the Passamaquoddies have not been "federally recog-

---

5. Defendants' appeal from the June 23, 1972 order was dismissed by the United States Court of Appeals for the First Circuit on motions filed by plaintiffs and defendants, after the Solicitor General had refused defendants permission to proceed.

6. On July 26, 1972, pursuant to stipulation, the Court ordered that the protective action filed against the State of Maine by the United States on behalf of the Passamaquoddies and a similar action filed by the United States on behalf of the Penobscot Indian Nation, United States v. Maine, Civil No. 1969 N.D., be held in abeyance on the Court's docket and that no action need be taken by the parties in either suit pending the outcome of the present action.

7. In their second amended and supplemental complaint, plaintiffs also seek a declaratory judgment that the Tribe is entitled to the protection of U. S. Const. art. I, § 8 ("The Congress shall have power . . . [t]o regulate Commerce . . . with the Indian Tribes"), art. I § 10 ("[n]o State shall enter into any Treaty . . . ") and art. II, § 2 ("[t]he President . . . shall have power, by and with the Advice and Consent of the Senate, to make Treaties . . . "). Plaintiffs have not pressed their initial request for this relief, and the applicability to the Passamaquoddies of these Constitutional provisions is not presently in issue.

nized," the Act is not applicable to them. Defendants and intervenor also deny that the Nonintercourse Act creates any trust relationship between the United States and the Indian tribes to which it applies.

In addition to denying that the Passamaquoddies are protected by the Nonintercourse Act, defendants and intervenor raise several affirmative defenses. First, they say that defendants' refusal to institute suit on behalf of the Passamaquoddies is not subject to judicial review under the provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., both because it is not "final agency action," 5 U.S.C. § 704, and because it constitutes "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Next, intervenor asserts that the Court lacks jurisdiction of the action because it presents a nonjusticiable "political question." Finally, intervenor contends that the case is not one in which declaratory relief is proper. Plaintiffs respond that these affirmative defenses are without merit.

The Court will deal separately with each of the issues thus presented.

### The Applicability of the Nonintercourse Act to the Passamaquoddies

The rules of statutory interpretation by which this Court must be guided in determining the applicability of the Nonintercourse Act to the Passamaquoddies are summarized in United States v. New England Coal and Coke Co., 318 F.2d 138 (1st Cir. 1963), as follows:

"In matters of statutory construction the duty of this court is to give effect to the intent of Congress, and in doing so our first reference is of course to the literal meaning of words employed." Unless the contrary appears, it is presumed that statutory words were used in their ordinary sense. A primary consideration is "the mischief to be corrected and the end to be attained" by the enactment of the legislation; and, where possible, its terms should be construed to give effect to the Congressional intent. Extrinsic aids such as the legislative history of the Act, and the accepted interpretation of similar language in related legislation, are helpful in interpreting ambiguous statutory language. Finally, administrative interpretations by the agency entrusted with the enforcement of the statute are persuasive. However, the power to issue regulations is not the power to change the law, and it is for the courts, to which the task of statutory construction is ultimately · entrusted, to determine whether or not administrative interpretations are consistent with the intent of Congress and the words of the Act. 318 F.2d at 142–143. (citations omitted).

Applying these rules of construction, the conclusion is inescapable that, as a matter of simple statutory interpretation, the Nonintercourse Act applies to the Passamaquoddies. The literal meaning of the words employed in the statute, used in their ordinary sense, clearly and unambiguously encompasses all tribes of Indians, including the Passamaquoddies; the plain language of the statute is consistent with the Congressional intent; and there is no legislative history or administrative interpretation which conflicts with the words of the Act.

The provisions of the Nonintercourse Act prohibiting dealings in Indian land without the consent of the United States have remained essentially unchanged since passage of the first Act in 1790.[8] The statute in effect in 1794, when Massachusetts negotiated its treaty with the Passamaquoddies, applied to land transactions with "any Indians or nation or tribe of. Indians," within the United States. Act of March 1, 1793, 1 Stat. 329, 330. Subsequent versions of the statute, including the present codification, have applied to land transactions with "any Indian nation or

---

8. *See* n. 1, *supra.*

tribe of Indians." The words employed in the statute are clear and unambiguous; the prohibition against dealings in Indian land without the consent of the United States is applicable to "any . . . tribe of Indians." In the present case, it is stipulated that the Passamaquoddies are a "tribe of Indians." It may be conceded that the Tribe has not been "federally recognized," but there is no suggestion in the statute that, as defendants and intervenor contend, the Act is not applicable to a particular Indian tribe unless that tribe has been recognized by the Federal Government by a formal treaty, mention of the tribe in a statute, or a consistent course of administrative conduct. A departure from the plain meaning of statutory language is only justified where the application of literal languge would be at variance with legislative intent as revealed by the statute as a whole and its legislative history. Marks v. United States, 161 U.S. 297, 301, 16 S.Ct. 476, 40 L.Ed. 706 (1896); Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 276, 131 Ct.Cl. 593, cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).

■ Neither defendants nor intervenor have suggested any reason why giving the term "any . . . tribe of Indians" its literal meaning, thereby encompassing the Passamaquoddies, would lead to a result at variance with the statutory objectives of the Nonintercourse Act. To the contrary, it is eminently clear that the literal interpretation of the statute is required to give effect to the Congressional intent. The Court is aware of no legislative history of the Nonintercourse Act, which might reveal whether the First Congress had in mind the Passamaquoddies when it enacted the 1790 Act. Nor have defendants been able to call to the Court's attention any administrative interpretation prior to the filing of the instant litigation as to the applicability of the Act to the Passamaquoddies or any similarly situated Indian tribe.[9] Every court, however, which has considered the purposes of the Act has agreed that the intent of Congress was to protect the lands of the Indian tribes in order to prevent fraud and unfairness. As the Supreme Court noted in Federal Power Commission v. Tuscarora Indian Nation, 362 U.S. 99, 119, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960):

> The obvious purpose of that [the Nonintercourse] statute is to prevent the unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the Government, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without its consent.

The decided cases are replete with similar statements of the Act's purpose. *E. g.,* United States v. Candelaria, 271 U.S. 432, 441–442, 46 S.Ct. 561, 562, 70 L.Ed. 1023 (1926) (the intent of Congress was "to prevent the Government's Indian wards from improvidently disposing of their lands and becoming homeless public charges," and thereby to protect "a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races"); Tuscarora Nation of Indians v. Power Authority, 257 F.2d 885, 888 (2d Cir. 1958), vacated as moot sub nom. McMorran v. Tuscarora Nation of Indians, 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960) (the statute was enacted "to prevent Indians from being victimized by artful scoundrels inclined to make a sharp bargain"); Alonzo v. United States, 249 F.2d 189, 196 (10th Cir. 1957), cert. denied, 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958) (the purpose of such legislation is to protect the Indians "against the loss of their lands by improvident disposition or

9. Clearly, the administrative determination made in response to this Court's order of June 16, 1972, cannot so qualify. An administrative ruling which is no sooner made than challenged is not authoritative. Davies Warehouse Co. v. Bowles, 321 U.S. 144, 156, 64 S.Ct. 474, 88 L.Ed. 635 (1944).

through overreaching by members of other races"); Seneca Nation of Indians v. United States, 173 Ct.Cl. 917, 923 (1965) ("From the beginning, this legislation has been interpreted as giving the Federal Government a supervisory role over conveyances by Indians to others, in order to forestall fraud and unfairness.").

■ . A plain meaning interpretation of the phrase "any . . . tribe of Indians" is also the only construction of the Nonintercourse Act which comports with the basic policy of the United States, as reflected in the Act, to protect the Indian right of occupancy of their aboriginal lands. Thus, in United States v. Santa Fe Pacific R. Co., *supra,* 314 U.S. at 348, 62 S.Ct. at 252, the Supreme Court cited the Act as embodying

> . . . the unquestioned general policy of the Federal Government to recognize such right of occupancy. As stated by Chief Justice Marshall in Worcester v. Georgia, *supra,* 6 Pet. [515,] at page 557, 8 L.Ed. 483, the Indian trade and intercourse acts "manifestly consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.

*Santa Fe* also established that "recognition" is not a prerequisite to Nonintercourse Act protection:

> Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action. As stated in the *Cramer* case [Cramer v. United States, 261 U.S. 219, 229, 43 S.Ct. 342, 67 L.Ed. 622 (1923)], "The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive." 314 U.S. at 347, 62 S.Ct. at 252.

In Oneida Indian Nation v. County of Oneida, *supra,* 414 U.S. at 667–668, 94 S.Ct. 772, decided last Term, the Supreme Court reaffirmed these fundamental propositions stated in *Santa Fe.* In *Oneida,* the Supreme Court also again summarized the policy of the United States to protect the rights of Indian tribes to their aboriginal lands:

> It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land. This the United States did with respect to the various New York Indian tribes, including the Oneidas. The United States also asserted the primacy of federal law in the first Nonintercourse Act passed in 1790, 1 Stat. 137, 138, which provided that "no sale of lands made by any Indians . . . within the United States, shall be valid to any person . . . or to any state . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." This has remained the policy of the United States to this day. See 25 U.S.C. § 177. 414 U.S. at 667–668, 94 S.Ct. at 777. (footnote omitted).

It is thus clear that the policy embodied in the Nonintercourse Act is to protect Indian tribes against loss of their

aboriginal lands by improvident disposition to members of other races. The Passamaquoddies, an Indian tribe, fall within the plain meaning of the statutory language, and there is no reason why they should be excluded from the protection which the Act affords.

Defendants and intervenor rely on a trilogy of Supreme Court cases, all involving the Pueblo Indians in New Mexico, for the contention that, despite the all-inclusive language of the Nonintercourse Act, the Act applies only to Indian tribes which have been "federally recognized" by treaty, statute or a consistent course of conduct: United States v. Joseph, 94 U.S. 614, 24 L.Ed. 295 (1876); United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913); United States v. Candelaria, *supra*. Close analysis of these decisions, however, leaves little doubt that the Act means what it says and that the protection of the Act is not limited to "recognized" tribes.

Congress had extended the 1834 Nonintercourse Act to the New Mexico and Utah territories in 1851. Act of Feb. 27, 1851, ch. 14, § 7, 9 Stat. 587. The applicability of the Act to the Indians of the Pueblo of Taos in New Mexico was at issue in the *Joseph* case. The Court there held that the Act applied only to "uncivilized" Indians, and therefore did not protect Indians such as the Pueblos and the Senecas or Oneidas of New York, who, unlike the "nomadic" Apaches, Comanches and Navajoes, had attained a high degree of civilization:

> The pueblo Indians, if, indeed, they can be called Indians, had nothing in common with this class. The degree of civilization which they had attained centuries before, their willing submission to all the laws of the Mexican government, the full recognition by that government of all their civil

rights, including that of voting and holding office, and their absorption into the general mass of the population (except that they held their lands in common), all forbid the idea that they should be classed with the Indian tribes for whom the intercourse acts were made, or that in the intent of the act of 1851 its provisions were applicable to them. The tribes for whom the act of 1834 was made were those semi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the limits of an organized State or Territory, and, in regard to their domestic government, left to their own rules and traditions; in whom we have recognized the capacity to make treaties, and with whom the governments, state and national, deal, with a few exceptions only, in their national or tribal character, and not as individuals. 94 U.S. at 617.

It is unclear whether the Court held that the Pueblos were a tribe outside the scope of the Act, or simply not a tribe. In either event, it is clear that, by the standards applied in *Joseph*, even if the case is still good law,[10] the Passamaquoddies in 1794 were "uncivilized" Indians to whom the Act would apply. More importantly, the Court's opinion plainly does not contain any suggestion that "federal recognition" is a precondition to the Act's applicability.

Defendants' reliance on the *Sandoval* case is equally misplaced. That case involved not the Nonintercourse Act, but the Act of January 30, 1897, ch. 109, 29 Stat. 506, a criminal statute prohibiting the introduction of intoxicating liquor into "Indian country." Congress had expressly made this statute applicable to lands owned by the Pueblo Indians as a condition to the admission of New Mexico to statehood. Act of June 20, 1910,

---

10. As plaintiffs point out, the Court's statement in *Joseph* that the Pueblos, the Senecas and the Oneidas would be outside the scope of the Act because of their high degree of civilization has been rejected with respect to all three tribes. United States v. Candelaria, *supra;* Oneida Indian Nation v. County of Oneida, *supra;* Seneca Nation of Indians v. United States, *supra*.

ch. 310, § 2, 36 Stat. 557. A criminal prosecution brought pursuant to the 1897 statute was dismissed by the District Court on the ground that Congress lacked authority to regulate the sale of liquor in the State of New Mexico. The issue presented to the Supreme Court was not one of statutory construction, as Congress had made it clear in the 1910 Act that the 1897 statute applied to the Pueblo Indians. The only issue before the Court was whether "the status of the Pueblo Indians and their lands is such that Congress competently can prohibit the introduction of intoxicating liquor into those lands notwithstanding the admission of New Mexico into statehood," 231 U.S. at 38, 34 S.Ct. at 3, or whether the Pueblos instead were "beyond the range of Congressional power under the Constitution." *Id.* at 49, 34 S. Ct. at 7. On this question, the Court concluded that since the Constitution expressly authorized Congress to regulate commerce with the Indian tribes and prior judicial decisions had affirmed the power and duty of Congress to enact protective legislation on behalf of dependent Indian communities, United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); Tiger v. Western Investment Co., 221 U.S. 286, 315, 31 S. Ct. 578, 55 L.Ed. 738 (1911), the law banning the sale of liquor in Indian country was a legitimate exercise of congress' power. United States v. Sandoval, *supra,* 231 U.S. at 45–46, 34 S.Ct. 1. The Court held that the determination by Congress that the Pueblos were a dependent Indian community entitled to the benefits of protective legislation presented a "political question," upon which the Court was bound to uphold the judgment of Congress unless the classification was so arbitrary as to constitute a usurpation of power. *Id.* at 47, 34 S.Ct. 1. *See* United States v. Holliday, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865).

In the *Candelaria* case, in 1926, the Supreme Court reexamined for the first time since *Joseph* the applicability to the Pueblo Indians of the 1834 Nonintercourse Act, as extended to the New Mexico territory in 1851. *Candelaria* was an action brought by the United States to quiet title to land of the Pueblo of Laguna occupied by José Candelaria, a non-Indian. The suit was brought on the theory that the Pueblos were wards of the United States, which therefore had the authority and was under a duty to protect them in the ownership of their lands. 271 U.S. at 437, 46 S.Ct. 561. The issue presented to the Supreme Court was whether the guardian-ward relationship between the United States and the Pueblos was such that the United States, as guardian of the Pueblos, was barred from bringing suit by a judgment involving title to the same land entered in a prior lawsuit in which the United States had not been joined as a party. *Id.* at 438, 46 S.Ct. 561. In reaching the conclusion that the Pueblos were wards of the United States whose lands could not be alienated without its consent, the Court had occasion to construe the language "any tribe of Indians" in the Nonintercourse Act:

> While there is no express reference in the provision to Pueblo Indians, we think it must be taken as including them. They are plainly within its spirit and, in our opinion, fairly within its words, "any tribe of Indians." Although sedentary, industrious, and disposed to peace, they are Indians in race, customs and domestic government, always have lived in isolated communities, and are a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races. It therefore is difficult to believe that Congress in 1851 was not intending to protect them, but only the nomadic and savage Indians then living in New Mexico. A more reasonable view is that the term "Indian tribe" was used in the acts of 1834 and 1851 in the sense of "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Montoya v. United

States, 180 U.S. 261, 266, 21 S.Ct. 358, 359 (45 L.Ed. 521). In that sense the term easily includes Pueblo Indians. *Id.* at 441–442, 46 S.Ct. at 563.

There is nothing in this language which would indicate that the Nonintercourse Act applies only to "federally recognized" Indians. Rather, *Candelaria* appears to erase any doubt *Joseph* may have created as to whether the all-inclusive language in the statute should be construed as its plain meaning dictates.[12]

■ Finally, even if a latent ambiguity might be found in the statutory language, two cardinal principles of statutory construction buttress plaintiffs' position that the Nonintercourse Act applies to all Indian tribes in the United States, including the Passamaquoddies. The Supreme Court has consistently held that language used in statutes conferring benefits or protection on Indians must be construed in a nontechnical sense, as the Indians themselves would have understood it, and that all ambiguities in such statutes are to be resolved in favor of the Indians. *See, e. g.,* Squire v. Capoeman, 351 U.S. 1, 6–8, 76 S.Ct. 611, 100 L.Ed. 883 (1956); Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918); Winters v. United States, 207

U.S. 564, 576, 28 S.Ct. 207, 53 L.Ed. 340 (1908); United States v. Payne, 264 U. S. 446, 448–449, 44 S.Ct. 352, 68 L.Ed. 782 (1924); United States v. Celestine, 215 U.S. 278, 290, 30 S.Ct. 93, 54 L.Ed. 195 (1904).

The Court holds that the Nonintercourse Act is to be construed as its plain meaning dictates and applies to the Passamaquoddy Indian Tribe.

*The Trust Relationship between the United States and the Passamaquoddies under the Nonintercourse Act*

■ Defendants have rejected plaintiffs' request for assistance on the ground that no trust relationship exists between the United States and the Passamaquoddies. The Court disagrees. In the only decided cases to treat this issue, the Court of Claims has, in a series of decisions during the last ten years, definitively held that the Nonintercourse Act imposes a trust or fiduciary[13] obligation on the United States to protect land owned by all Indian tribes covered by the statute: Seneca Nation of Indians v. United States, *supra*; United States v. Oneida Nation of New York, 477 F.2d 939, 201 Ct.Cl. 546 (1973); Ft. Sill Apache Tribe v. United States, 477 F.2d 1360, 1366, 201 Ct.Cl. 630 (1973).

12. Defendants also refer to the recent case of Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), and to an unreported opinion letter of the District Court in Avalos v. Morton, Civil No. 9920 (D.N.M., September 10, 1974), as supporting their contention that general Indian statutes only apply to "federally recognized" tribes. *Mancari* involved no issue of statutory construction. Instead, it involved a Fifth Amendment Due Process challenge to the Indian Preference in Employment Act, 25 U.S.C. § 472. The Supreme Court did no more than approve the constitutional validity of the Indian preference as rationally related "to the fulfillment of Congress' unique obligation toward the Indians." 417 U.S. at 555, 94 S.Ct. at 2485. The *Avalos* letter resulted from the failure of counsel for the Indian plaintiffs to offer any brief or other argument on the issues in that case. Plaintiffs were suing for benefits afforded members of Indian tribes under the Snyder Act, 25 U.S.C. § 13. The District Court, relying

primarily on *Sandoval*, ruled that since it did not have authority to recognize the plaintiffs as a tribe, the action should be dismissed. It is unclear from the letter whether the dismissal was based upon a fundamental misreading of *Sandoval* or upon the failure of the plaintiffs to establish that they were "in fact an American Indian Tribe." (Letter of court page 3). In the present case, it is stipulated that the Passamaquoddies are in fact an Indian tribe.

13. The courts have used interchangeably the terms "trust," "fiduciary," and "guardianward" to describe the relationship between the Federal Government and the Indian tribes. *E. g.* Seminole Nation v. United States, 316 U.S. 286, 296–297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); Cherokee Nation v. Georgia, 5 Pet. (30 U.S.) 1, 17, 8 L.Ed. 25 (1831); United States v. Seminole Nation, 173 F.Supp. 784, 790–791, 146 Ct.Cl. 171 (1959); Gila River Pima-Maricopa Indian Community v. United States, 140 F.Supp. 776, 780–781, 135 Ct.Cl. 180 (1956).

These decisions are supported by a century of federal Indian case law which has recognized the existence of a fiduciary relationship between the Federal Government and the Indian tribes.

The courts were first squarely presented with the question of the nature of the obligation, if any, imposed by the Nonintercourse Act in Seneca Nation of Indians v. United States, *supra*. In that case, the Senecas sued the United States under the Indian Claims Commission Act, 25 U.S.C. § 70a, claiming damages arising out of four sales of their New York lands at allegedly inadequate prices, to private parties. They alleged that a representative of the United States was present at each of the sales and that the United States breached a fiduciary duty owed the tribe by permitting the unconscionable transactions. The Indian Claims Commission dismissed the claims on the ground that the Federal Government was not responsible for the transactions. The Court of Claims agreed as to the first sale, which took place in 1788 prior to the passage of the Nonintercourse Act, but reversed as to the three later sales, which occurred subsequent to the adoption of the Act in 1790. With respect to the Act, the court began by noting that:

> [T]he requirement has always been for federal consent and participation in any disposition of Indian real property. From the beginning, this legislation has been interpreted as giving the Federal Government a supervisory role over conveyances by Indians to others, in order to forestall fraud and unfairness. *Id.* at 923.

The court then quoted at length from President Washington's speech to the Senecas in December 1790, shortly after the passage of the Act:

> Here, then, is the security for the remainder of your lands. No State, no person, can purchase your lands, unless at some public treaty, held under the authority of the United States. *The General Government will never consent to your being defraud-*

> *ed, but it will protect you in all your just rights.* \* \* \* But your great object seems to be, the security of your remaining lands; and I have, therefore, upon this point, meant to be sufficiently strong and clear, that, in future, you cannot be defrauded of your lands; that you possess the right to sell, and the right of refusing to sell, your lands; that, therefore, the sale of your lands, in future, will depend entirely upon yourselves. But that, when you may find it for your interest to sell any part of your lands, the United States must be present, by their agent, *and will be your security that you shall not be defrauded in the bargain you may make.* \* \* \* That, besides the before mentioned security for your land, you will perceive, *by the law of Congress for regulating trade and intercourse with the Indian tribes, the fatherly care the United States intend to take of the Indians.* . . . American State Papers (Indian Affairs, Vol. I, 1832), p. 142. *Id.* at 923–24 (emphasis in original).

This contemporary executive pronouncement, the court observed "plainly show[s] the Federal Government as thenceforth the guardian and preserver of fairness to the Indians in their land dispositions." *Id.* at 924. After reviewing prior judicial construction of the Act, the court concluded:

> In the light of its language, contemporaneous construction, and history, we hold that the Trade and Intercourse Act created a special relationship between the Federal Government and those Indians covered by the legislation, with respect to the disposition of their lands, and that the United States assumed a special responsibility to protect and guard against unfair treatment in such transactions. *Cf.* The Oneida Tribe of Indians v. United States, 165 Ct.Cl. 487 (1964), cert. denied, 379 U.S. 946. [85 S.Ct. 441, 13 L.Ed.2d 544] This responsibility was not merely to be present at the negotiations or to prevent actual fraud, deception, or duress alone; improvid-

ence, unfairness, the receipt of an unconscionable consideration would likewise be of federal concern. . . . The concept is obviously one of full fiduciary responsibility, not solely of traditional market-place morals. When the Federal Government undertakes an "obligation of trust" toward an Indian tribe or group, as it has in the Intercourse Act, the obligation is "of the highest responsibility and trust," not that of "a mere contracting party" or better business bureau. *Cf.* Seminole Nation v. United States, 316 U.S. 286, 296–97 [62 S.Ct. 1049, 86 L.Ed. 1480] (1942). *Id.* at 925.

■ In *Oneida Nation* and *Ft. Sill Apache Tribe,* the Court of Claims, in unequivocal language, reaffirmed the holding of *Seneca Nation* "that the Trade and Intercourse Act establishes a fiduciary relationship between the Indians and the United States Government." United States v. Oneida Nation of New York, *supra,* 477 F.2d at 942–943; Ft. Sill Apache Tribe v. United States, *supra,* 477 F.2d at 1366. Moreover, in *Oneida Nation,* the court made clear that by virtue of the fiduciary duty imposed by the Nonintercourse Act, the United States has an obligation to do whatever is necessary to protect Indian land when it becomes aware that Indian rights have been violated, even though the United States did not participate in the unconscionable transaction:

The Government would argue that the absence of participation in the remaining twenty-three (23) treaties releases it from any fiduciary duty that might have existed. Although the Government did not actually participate in the remaining treaties, we hold the fiduciary relationship would continue to exist if the Government had either actual or constructive knowledge of the treaties. With such knowledge, if the Government subsequently failed to protect the rights of the Indians, then there would be a breach of the fiduciary relationship. This court does not see any distinction between *participation* and failure to

exercise a duty, and *knowledge* and the failure to exercise the same duty. *Id.* 477 F.2d at 944 (emphasis in original; footnotes omitted).

These Court of Claims decisions are consistent with an unbroken line of Supreme Court decisions which, from the beginning, have defined the fiduciary relationship between the Federal Government and the Indian tribes as imposing a distinctive obligation of trust upon the Government in its dealings with the Indians. In the early case of Cherokee Nation v. Georgia, *supra,* 5 Pet. (30 U.S.) at 17, 8 L.Ed. 25, Chief Justice Marshall described the condition of the Indians as "in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian." The following year, in Worcester v. Georgia, 6 Pet. (31 U.S.) 515, 556, 8 L.Ed. 483 (1832), the same Chief Justice observed that the laws enacted by Congress for the protection of the Indians, and especially the Nonintercourse Act, "manifestly consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States." Fifty years later, in United States v. Kagama, *supra,* 118 U.S. at 383–384, 6 S.Ct. at 1114, the Court reaffirmed that "[t]hese Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. . . . From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power." (emphasis in original). Again, in Tiger v. Western Investment Co., *supra,* 221 U.S. at 310, 31 S.Ct. at 584, the Court stated, ". . . the Congress of the United States has undertaken from the earliest history of the Government to deal with the Indians as dependent people and to legislate concerning their property with a view to

their protection as such." More recently, in Seminole Nation v. United States, n.13 *supra,* 316 U.S. at 297, 62 S.Ct. at 1055, the Court recognized that the United States "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged with the most exacting fiduciary standards." Finally, in Federal Power Commission v. Tuscarora Indian Nation, *supra,* 362 U.S. at 119, 80 S.Ct. at 555, the Supreme Court said with specific reference to the Nonintercourse Act:

> The obvious purpose of that statute is to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the Government, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without its consent.

The Court of Claims decisions are also supported by numerous Supreme Court cases which have held that the power of Congress to restrict the alienation of Indian land is justified only by the existence of the guardian-ward relationship between the Federal Government and the Indian tribes. *E. g.,* Sunderland v. United States, 266 U.S. 226, 233–234, 45 S.Ct. 64, 69 L.Ed. 259 (1924); Brader v. James, 246 U.S. 88, 98, 38 S.Ct. 285, 62 L.Ed. 591 (1918); Tiger v. Western Investment Co., *supra,* 221 U.S. at 316, 31 S.Ct. 578; Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 47 L.Ed. 299 (1903); Cherokee Nation v. Hitchcock, 187 U.S. 294, 306–308, 23 S.Ct. 115, 47 L.Ed. 183 (1902); United States v. Kagama, *supra,* 118 U.S. at 384,[14] 6 S.Ct. 1109.

In view of the foregoing, the conclusion must .be that the Nonintercourse Act establishes a trust relationship between the United States and the Indian tribes, including the Passamaquoddies,[15] to which it applies. The Court holds that defendants erred in denying plaintiffs' request for litigation on the sole ground that no trust relationship exists between the United States and the Passamaquoddy Indian Tribe.[16]

14. The imposition of a legal incapacity combined with an undertaking to ensure fairness in transactions involving the incapacitated party's property constitutes the most literal kind of guardianship.

> A guardian of the property of a person who is under an incapacity is a trustee in the broad sense of the term. He is under a duty to his ward to deal with the property for the latter's benefit. Like a trustee a guardian is a fiduciary. He is not, however, a trustee in the strict sense. He is entrusted with the possession and management of his ward's property but he does not take title to it. Scott, Law of Trusts (3rd Ed. 1967) § 7 at 71.

15. While apparently not denying that the Nonintercourse Act may have at one time protected the Passamaquoddies, intervenor argues that the Federal Government has since terminated its obligations toward the Passamaquoddies by acquiescing in Maine's assumption of responsibility for the Tribe. It is clear, however, that termination of the Federal Government's responsibility for an Indian tribe requires "plain and unambiguous" action evidencing a clear and unequivocal intention of Congress to terminate its

relationship with the tribe. United States v. Santa Fe Pacific R. Co., *supra,* 314 U.S. at 346, 62 S.Ct. 248; United States v. Nice, 241 U.S. 591, 599, 36 S.Ct. 696, 60 L.Ed. 1192 (1916). *See also* Menominee Tribe of Indians v. United States, 391 U.S. 404, 412–413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Congress has never expressly terminated its relationship with the Passamaquoddy Tribe, and the mere fact that the Federal Government has not objected to Maine's undertaking certain obligations for the protection of the Passamaquoddies does not *evidence such a clear and unequivocal Congressional intent as will support a finding of termination.*

16. Whether the United States breached its fiduciary duty to plaintiffs by refusing to bring suit against the State of Maine for the redress of alleged violations of the Nonintercourse Act is a question not presently before the Court. In the present action plaintiffs seek no more than a declaratory judgment that defendants erred in denying their request solely on the erroneous legal ground that no trust relationship exists between the United States and the Passamaquoddies. However, to the effect that the Govern-

### The Affirmative Defenses

Defendants and intervenor have raised a number of affirmative defenses, which they assert preclude the Court from ruling upon the substantive issues presented by the action. The Court finds these to be without merit.

 *The Political Question Doctrine.* Intervenor contends that the Court lacks jurisdiction of the action because it presents a nonjusticiable "political question." Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961). The position is that "the scope and nature of federal responsibility over Indian tribes is not a matter for the courts to determine." The decisions cited as authority for this proposition, however, deal solely with the *power* of Congress to legislate with respect to Indians. They fall into two categories: (1) cases in which the constitutional power of Congress to enact legislation respecting a particular group of Indians is challenged on the ground that the group is not an "Indian tribe" within the meaning of the Commerce Clause: Board of Commissioners v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943); United States v. McGowan, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938); United States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 (1926); United States v. Nice, n.15 *supra*; Perrin v. United States, 232 U.S. 478, 34 S. Ct. 387, 58 L.Ed. 691 (1914); United States v. Sandoval, *supra*; Tiger v. Western Investment Co., *supra*; United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903); United States v. Holliday, *supra; see also* Baker v. Carr, *supra,* 369 U.S. at 282, 82 S.Ct. 691 (Frankfurter, J., dissenting); and (2) cases which hold that Congressional action involving the administration of Indian affairs is not subject to judicial challenge on the ground that it violates previous treaty commitments. Federal

Power Commission v. Tuscarora Indian Nation, *supra*; Sioux Indians v. United States, 277 U.S. 424, 48 S.Ct. 536, 72 L. Ed. 939 (1928); Lone Wolf v. Hitchcock, *supra*. There is no dispute in this case that Congress has the power under the Commerce Clause to pass protective legislation on behalf of the Passamaquoddy Tribe; nor is there any claim that application of the Nonintercourse Act to the Passamaquoddies would violate any prior treaty commitment. The only issue before this Court is whether Congress, once having exercised its power to pass protective legislation on behalf of the Indians, meant to include the Passamaquoddies. This presents a question of legislative intent, which has always been for resolution by the courts. *See, e. g.,* Morton v. Ruiz, 415 U.S. 199, 212–229, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). It is clear that this case presents no nonjusticiable political question.

 *The Availability of Review under the Administrative Procedure Act.* The defendants and intervenor assert that defendants' refusal to institute suit on behalf of the Passamaquoddies against the State of Maine is not subject to judicial review under the provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Their argument is twofold. First, they contend that defendants' action is not "final agency action" reviewable under 5 U.S.C. § 704. While they concede that the decision of the Attorney General was final action, they argue that the decision of the Secretary of the Interior not to recommend litigation must be "treated separately" and that, so regarded, the Secretary's determination is not judicially-reviewable final action. The record before the Court clearly establishes, however, that the Attorney General relied exclusively on the recommendation of the Secretary in making his decision [17] and that the

---

ment's obligation may include the duty to litigate, see Mason v. United States, 461 F.2d 1364, 1372–1373, 198 Ct.Cl. 599 (1972), rev'd on other grounds, 412 U.S. 391, 93 S. Ct. 2202, 37 L.Ed.2d 22 (1973).

17. The Court rejects as specious defendants' argument that, because the Notice filed by the defendants with this Court on June 22, 1972 (p. 6 *supra)* stated that the Attorney General's decision not to bring suit was

actions of the Attorney General and the Secretary were but two stages of a single administrative process. In the instant action, plaintiffs seek review of the result of this combined administrative determination. Furthermore, there is concededly a final order before the Court, and the Administrative Procedure Act, 5 U.S.C. § 704, expressly provides that an "intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." The cases cited by defendants, Chicago and Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 112–113, 68 S.Ct. 431, 92 L.Ed. 568 (1948), and Federal Power Commission v. Hope Gas Co., 320 U.S. 591, 619, 64 S.Ct. 281, 88 L.Ed. 333 (1944), involved attempts to review an intermediate stage of administrative action without reviewing the ultimate stage; they are inapposite where the ultimate action is itself being reviewed.[18]

 The second argument presented by defendants and intervenor as preventing judicial review under the Administrative Procedure Act is that defendants' action constitutes "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a)(2). The thrust of the argument is that the Attorney General has absolute discretion to institute litigation, 28 U.S.C. §§ 516,

519, and that judicial review of his exercise of that discretion is barred by the doctrine of prosecutorial discretion. United States v. Nixon, 417 U.S. 418, 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479, 480–481 (1967); Smith v. United States, 375 F. 2d 243, 246–247 (5th Cir. 1967); Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 379–382 (2d Cir. 1973); Weiss v. Morgenthau, 233 F.Supp. 307, 308 (S.D.N.Y.1964), aff'd per curiam, 344 F.2d 428 (2d Cir. 1965); Application of James, 241 F. Supp. 858, 860 (S.D.N.Y.1965); Boyd v. United States, 345 F.Supp. 790, 794 (E. D.N.Y.1972).[19] This contention is based on two fundamental misconceptions. In the first place, plaintiffs do not ask this Court to order the Attorney General to bring suit on their behalf; in the present action, plaintiffs seek only a declaratory judgment that the Nonintercourse Act establishes a trust relationship between the United States and the Passamaquoddies. In the second place, the doctrine of prosecutorial discretion cannot shield legal error. As the court stated in Nader v. Saxbe, 497 F.2d 676, 679–680 n. 19 (D.C.Cir.1974),

It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion

made "consistent with" the Secretary's determination that no trust relationship exists, that was not the sole basis for the Attorney General's decision. The Notice incorporated the determination of the Interior Department and stated that, consistent with that decision, the Justice Department was declining to institute the action requested by plaintiffs. The Notice was filed in response to the Court's order of June 16, 1972 directing defendants, in the event their decision was to deny plaintiffs' request, to state their reasons for so deciding. The only reason stated in the Notice is the Secretary's determination that no trust relationship exists. It is clear that the Attorney General adopted the Secretary's determination as his only reason for declining to bring suit.

18. The defendant Secretary is a proper party because the Department of the Interior is the federal agency primarily responsible for

protecting Indian land and administering government policy pursuant to statutes such as the Nonintercourse Act. See, e. g., Hynes v. Grimes Packing Co., 337 U.S. 86, 96–97, 69 S.Ct. 968, 93 L.Ed. 1231 (1949); Boles v. Greenville Housing Authority, 468 F.2d 476, 479 (6th Cir. 1972).

19. Similarly, intervenor cites several cases which stand merely for the proposition that 25 U.S.C. § 175 (requiring that the United States Attorney "shall" represent all Indians in all suits at law and equity) does not impose a mandatory duty. Rincon Band of Mission Indians v. Escondido Mutual Water Co., 459 F.2d 1082, 1084–1085 (9th Cir. 1972); United States v. Gila River Pima-Maricopa Indian Community, 391 F.2d 53, 56 (9th Cir. 1968); Siniscal v. United States, 208 F.2d 406, 410 (9th Cir. 1953), cert. denied, 348 U.S. 818, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

generally, is subject to statutory and constitutional limits enforceable through judicial review. The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority. Judicial review of the latter sort is normally available unless Congress has expressly withdrawn it. (citations omitted).

*See also* Boyd v. United States, *supra*, 345 F.Supp. at 792–793. Where, as in the present case, the decision of an administrative official is based upon an erroneous legal conclusion, the courts have an obligation to correct the error so that he may exercise his discretion based upon a correct understanding of the law. Perkins v. Elg, 307 U.S. 325, 349–350, 59 S.Ct. 884, 83 L.Ed. 1320 (1939); Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); McGrath v. Kristensen, 340 U.S. 162, 168–171, 71 S. Ct. 224, 95 L.Ed. 173 (1950). *See* 5 U. S.C. § 706. *Cf.* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The Administrative Procedure Act does not bar judicial review of defendants' action.

■ *The Propriety of Declaratory Relief.* Intervenor contends that since the Court is without authority to compel the Attorney General to file suit on behalf of plaintiffs, the prayer for declaratory relief is merely an effort to obtain an advisory opinion, which the Court should decline to render. *See* Sierra Club v. Morton, 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Public Service Commission v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Intervenor's argument is identical to that rejected by the Supreme Court in Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In that case, Adam Clayton Powell sought both a declaratory judgment that the House of Representatives could not constitutionally prevent him from taking his seat because of prior misconduct, and a writ of mandamus or an injunction to compel officers and employees of the House to seat him. The District Court dismissed the complaint, and the Court of Appeals affirmed on the grounds that the case was not justiciable because the requested coercive relief would bring the judiciary into open conflict with a coordinate branch and a declaratory judgment would "not finally terminate the controversy." Powell v. McCormack, 129 U.S.App.D.C. 354, 395 F.2d 577, 597 (1968). The Supreme Court reversed and remanded the case to the District Court with instructions to enter a declaratory judgment for Powell and to consider other appropriate remedies. With respect to the defendants' claim of nonjusticiability because the Court lacked power to grant coercive relief, the Court said:

We need express no opinion about the appropriateness of coercive relief in this case, for the petitioners sought declaratory judgment, a form of relief the District Court could have issued. The Declaratory Judgment Act, 28 U. S.C. § 2201, provides that a district court may "declare the rights . . . of any interested party . . . whether or not further relief is or could be sought." The availability of declaratory relief depends on whether there is a live dispute between the parties, and a request for declaratory relief may be considered independently of whether other forms of relief are appropriate. We thus conclude that in terms of the general criteria of justiciability, this case is justiciable. 395 U.S. at 517–518, 89 S.Ct. at 1962 (citations omitted).

It is thus clear that plaintiffs are not barred from declaratory relief merely because this Court may not be able to fashion coercive relief. *See also* Perkins v. Elg, *supra*, 307 U.S. at 349–350, 59 S. Ct. 884; McGrath v. Kristensen, *supra*, 340 U.S. at 168–171, 71 S.Ct. 224.

\* \* \* \* \* \*

Judgment will be entered for the plaintiffs declaring that the Indian Nonintercourse Act, 25 U.S.C. § 177, is applicable to the Passamaquoddy Indian Tribe; that the Act establishes a trust relationship between the United States and the Tribe; and that defendants may not deny plaintiffs' request for litigation in their behalf on the sole ground that there is no trust relationship between the United States and the Tribe. Plaintiffs may submit a proposed form of decree, with notice to defendants, within ten days. Defendants may present their comments thereon within five days thereafter.

It is so ordered.

### APPENDIX

#### I

#### *Contacts between the Federal Government and the Passamaquoddy Tribe since 1776*

1. On December 24, 1776, George Washington wrote to the Passamaquoddy Tribe and told them that he was glad to hear that the Tribe had accepted the chain of friendship which he sent in February 1776, and warned the Tribe against turning against the United States.

2. John Allan served as the Continental Congress' agent to the Indians of the Northeast during the American Revolutionary War. Appointed in 1777, he was instructed to enlist the support of the Indian tribes for the American colonies. In May 1777 Allan met with the Passamaquoddy and St. John's Tribes. In recognition of Allan's promises that the Tribe would be given ammunition for hunting, protection of their game and hunting grounds, regulation of trade to prevent imposition, the exclusive right to hunt beaver, the free exercise of religion, a clergyman, and the appointment of an agent for their protection and support in time of need, the Passamaquoddy Tribe pledged their support to the colonies.

In 1783 and 1784 Allan wrote several letters to the Federal Government in which he indicated that the Passamaquoddy Indians had greatly assisted the American cause and urged Congress to fulfill the promises he had made on behalf of the Government, especially with respect to protecting Passamaquoddy hunting grounds. Congress failed to act on Allan's recommendations, and on March 5, 1784, Allan's appointment was revoked pursuant to a resolution of the Continental Congress revoking the appointments of all Indian Superintendents.

3. In 1793 the same John Allan appeared before the Massachusetts General Court. He reported that during the Revolutionary War the Passamaquoddy Tribe had relinquished their claims to land in Massachusetts on the condition that the United States would confirm the Tribe's right to inhabit, unmolested, certain parcels of their aboriginal territory.

4. In 1819 Congress passed legislation entitled, "An Act making provision for the civilization of the Indian tribes adjoining the frontier settlements." Act of March 3, 1819, 3 Stat. 516. In 1824, using funds appropriated pursuant to this Act, the Federal Government contributed $233.00 to the Tribe, an amount which covered one-third of the cost of the construction of a school. From 1824 to 1828 the Federal Government used funds appropriated pursuant to the 1819 Act to contribute $250.00 a year to Elijah Kellogg, a missionary to the Indians, who sought to establish and maintain a school for the Passamaquoddies. In 1829 the Government withheld funds for the school because of intra-tribal disputes concerning the religion of the Superintendent. In December 1829 two leaders of the Passamaquoddy Tribe, Deacon Sockbason and Sabattis Neptune, met in Washington with Thomas L. McKenny, Director of the Office of Indian Affairs, and John H. Eaton, Secretary of War, seeking a reinstatement of the funds for the school, money to hire a priest, and a parcel of land. Although

the funds for the school were temporarily reinstated and money for a priest was provided, all funds were permanently terminated in 1831 because of the continuation of sectarian strife.

5. In December 1829 President Jackson requested funds from Congress to purchase additional land for the Passamaquoddy Tribe. Congress failed to act on the President's request.

6. In July 1832 the Commissioner of Indian Affairs, Elbert Herring, denied Kellogg's request for funds for the improvement of Passamaquoddy agriculture.

7. During the period 1899 to 1912, five members of the Passamaquoddy Tribe attended the Carlisle Indian School at Carlisle, Pennsylvania. In 1970 a member of the Passamaquoddy Tribe graduated from Haskel Indian College at Lawrence, Kansas.

8. Since 1965 the Tribe has received funds from the Department of Housing and Urban Development, the Office of Economic Opportunity and Federal agencies other than the Department of the Interior. Although eligibility for such assistance has been determined by criteria applicable to all citizens, in many instances the funds were taken from special Indian allocations or were administered by special Indian desks within the various agencies.

## II

*Contacts between the States of Massachusetts and Maine and the Passamaquoddy Tribe since 1776 Massachusetts Contacts*

1. On July 19, 1776, the Governor of Massachusetts on behalf of Massachusetts and the other states entered into a treaty of alliance and friendship with delegates from the St. John's and Micmac Tribes in which the Indian delegates agreed to use their influence to convince the Passamaquoddy and other tribes to supply men for George Washington's army.

2. In 1792 leaders of the Passamaquoddy Tribe petitioned Massachusetts for land where they could "assemble unmolested." In response to the petition, the Massachusetts Legislature appointed a committee to assign land to the Passamaquoddy Indians. Treaty negotiations began in 1793, and on September 24, 1794 Massachusetts and the Passamaquoddy Tribe entered into a treaty. John Allan, the former Federal Indian agent, was one of the members of the committee appointed by the Massachusetts Legislature, and his name appears as one of the signers of the treaty for Massachusetts. By the terms of the treaty, the Passamaquoddy Tribe surrendered all claims to land in the territory of Massachusetts in exchange for a conveyance of 23,000 acres of land at Indian Township, ten acres of land at Pleasant Point, and the exclusive right to fish and hunt the Schoodic River, all in the District of Maine. Seven years later, in 1801, Massachusetts assigned an additional 90 acres of land at Pleasant Point to the Tribe.

3. In 1819 Massachusetts passed legislation commonly known as the Articles of Separation, which provided for the establishment of Maine as a separate State. Under the Articles of Separation Maine agreed to "assume and perform all duties and obligations of the Commonwealth, towards the Indians within said District of Maine, whether the same arise from treaties or otherwise, . . . ." *See* n. 2, *supra.*

### Maine Contacts

4. Since its admission as a State in 1820, Maine has enacted approximately 350 laws which relate specifically to the Passamaquoddy Tribe. This legislation includes 72 laws providing appropriations for or regulating Passamaquoddy agriculture; 33 laws making provision for the appropriation of necessities, such as blankets, food, fuel, and wood, for the Tribe; 85 laws relating to educational services and facilities for the Tribe; 13 laws making provision for the delivery of health care services and facilities to the Tribe; 22 laws making allowance for Passamaquoddy housing

(Me.Const. art. 9, § 14–D, authorizes the Legislature to make available a fund not to exceed $1,000,000.00 for the purpose of insuring mortgages on homes owned, "by members of the 2 tribes on several Indian reservations") ; 54 laws making special provision for Indian indigent relief; 54 laws relating to the improvement and protection of roads and water on the Passamaquoddy reservation; and 15 laws providing for the legal representation of the Tribe and its members.

5. The following is a representative sample of Maine statutes currently in effect providing for the welfare and protection of the Passamaquoddy Tribe.

 a. Beginning in 1823 Maine has administered trust funds on behalf of the Passamaquoddy Tribe. 22 M.R.S.A. § 4834, as amended, P. L.1973, ch. 141, creates a trust fund out of the annual net proceeds from the sale of timber and grass taken from Indian Township. This statute permits the tribal council to determine the manner in which a certain percentage of the funds shall be expended.

 b. 22 M.R.S.A. § 4707 renders void any contract made by an Indian for the sale or disposal of trees, timber, or grass on Indian lands.

 c. 22 M.R.S.A. § 4709 authorizes the Attorney General, on his own initiative or at the request of a Tribe, to sue in the name of the Tribe in actions for money owed the Tribe for injuries done to tribal land. The damages recovered by such a suit are to be distributed by the Commissioner of Indian Affairs, or invested in useful articles.

 d. In 1954 an amendment to the Maine Constitution, Me.Const. art. 2, § 1, extended the franchise to Indians. 22 M.R.S.A. § 4831, as amended, P.L.1973, ch. 104, authorizes an official tribal government. This statute provides that each Passamaquoddy reservation shall have a governor, lieutenant governor, and six-man tribal council. It further provides that each reservation shall elect, on an alternate basis, a representative to the State Legislature to serve as the Passamaquoddy representative.

 e. 22 M.R.S.A. § 4702, as amended P.L.1971, ch. 544, establishes a Department of Indian Affairs, which is under the control and supervision of the Commissioner of Indian Affairs. 22 M.R.S.A. § 4733, as adopted, P.L.1967, ch. 252, eff. May 8, 1967, provides for the creation of an Indian Housing Authority.

 f. Maine has always retained a variety of miscellaneous laws which affect various aspects of Passamaquoddy tribal life. For instance, current Maine statutes permit members of the Tribe to obtain free hunting and fishing licenses, 12 M.R.S.A. § 2401–B(7), as amended, P.L.1973, ch. 92; forbid any person from keeping Indian skeletons or bones for more than a year without returning them to the Tribe for burial, 22 M.R.S.A. § 4720, as adopted, P.L.1973, ch. 788, §§ 95, 96, eff. April 1, 1974; and impose a $250.00 fine upon any person who poses as an Indian for the purpose of vending goods or wares, 22 M.R.S.A. § 4715.